**John Lanahan**
California State Bar No. 133091
501 West Broadway, Suite 1510
San Diego, California 92101-3526
Telephone: (619) 237-5498
lawnahan@sbcglobal.net

Attorney for Jose Serrano

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HON. JANIS L. SAMMARTINO)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>JOSE SERRAN0,<br><br>　　　　　　　Defendant. | CASE NO.:　21-cr-1590-JLS<br><br>Date: November 1, 2022<br>Time: 9:00<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIREARM CHARGES |

INTRODUCTION

Jose Serrano moves this Court to dismiss the indictment's §§ 922(g)(1) and 924(c)(1)(A) charges. These charges allege that Mr. Serrano possessed a firearms in his home, which is conduct covered by the plain text of the Second Amendment's plain text. Under the Supreme Court's recent decision *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the burden shifts to the government to show an historical tradition regulating Mr. Serrano's possession of a firearm, as a felon (counts one through four in violation of 18 U.S.C. § 922(g)(1)); in furtherance of a drug trafficking crime (counts seven through ten, in violation of 18 U.S.C. § 294(c)); possession of a firearm with a

1

obliterated serial number (count eleven, in violation of 18 U.S.C. § 922(k)); and possession of an unregistered firearm (count twelve, in violation of 26 U.S.C. §§ 5861(d) and 5871). The government cannot meet its burden.

Of critical importance under the analysis in *Bruen,* there is no historical tradition prohibiting felons from possessing handguns. The earliest felon-in-possession law is from 1914. From 17th-century England until the Reconstruction, there is no historical analogue of disarming whole groups of the populace due to their status as a felon. To the contrary, early Americans used targeted regulations to prevent dangerous people from committing crimes with guns, and even persons feared as dangerous could still keep firearms for self-defense. In some instances, state courts and Congress recognized that permanent disarmament—even of those who committed treason—was incompatible with the traditional right to bear arms.

There is also no historical tradition prohibiting handgun possession in furtherance of trafficking drugs. Penalties for having guns during illicit commercial activities such as gambling, prostituting, or selling a banned substance are modern inventions. Sentence enhancements for possessing weapons during *any* crime are themselves products of a late-nineteenth-century trend; the current penalty for possession of a firearm  in furtherance of drug sales, 18 U.S.C. §section 924(c), was not enacted until 1968

"[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008). The "Second Amendment guarantee[s] to all Americans the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions," *Bruen*, 142 S. Ct. at 2156, and the government cannot prove the existence of historical, well-defined restrictions distinctly similar to the ones charged here. This Court must therefore dismiss counts one through four,

21cr1590-JLS

charging felon in possession of a firearm; counts seven through ten, charging possession of a firearm in furtherance of a drug trafficking crime, count eleven, charging possession of a firearm with an obliterated serial number; and count twelve, charging possession of an unregistered firearm.

## I.   Statement of Facts

As noted in Mr. Serrano's previously filed motion to suppress evidence illegally seized a the result of an illegal search of his home at 1760 Fernwood Road in Chula Vista on March 15, 2021, a disabled .45 cal. handgun, several rounds of ammunition, , a firearm magazine, an ammunition can, three rifles , and one 9mm handgun with fifteen rounds of ammunition were seized and form the basis of the charges alleged in this case.

## II.      THE CHAGES FILED VIOLATE THE SECOND AMENDMENT

The Second Amendment to the United States Constitution states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It codified the pre-existing right to defend oneself from dangers inherent to living among others. *Bruen*, 142 S. Ct. at 2128. *Bruen* compels the conclusion that § 922(g)(1) and § 924(c)(1)(A) impermissibly infringe upon that right.

### A.   *Bruen* adopted a new approach to the Second Amendment, overruling contrary Ninth Circuit precedent.

#### 1.   *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms.

To determine whether government action infringes on the Second Amendment, the Ninth Circuit in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), had previously applied a two-step test. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases). Under that test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. (simplified). This was satisfied if the law

21cr1590-JLS

"burden[ed] conduct that was within the scope of the Second Amendment as historically understood." *Id*.

If it did, courts "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id*. The level of scrutiny depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id*. at 1138 (quotations omitted). This could vary between intermediate and strict scrutiny. *See id*. at 1137 (citing *Heller*, 554 U.S. at 628 n.27). Courts always assigned *some* weight to the government's interest in public safety and "keeping firearms away from those most likely to misuse them." *Id*. at 1139 (simplified).

That was revisited by the Supreme Court in *Bruen*, which held that this second step was "one step too many" because only constitutional text and history can justify a firearms regulation. *Bruen*, 142 S. Ct. at 2127. *Bruen* analyzed whether a law allowing gun license denials for lack of "proper cause" violated the Second Amendment. *Id*. at 2123. Under the law's "demanding" standard, officials had broad discretion to withhold a license, absent "a special need for self-protection distinguishable from that of the general community." *Id*. (quotations omitted). *Bruen* considered whether such "may issue" laws violate the Second Amendment.

*Bruen* began by affirming the first step: that courts examine "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id*. at 2127–28 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id*. at 2128–29. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id*. at 2126. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2130, 2126. This inquiry requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id*. at 2138.

21cr1590-JLS

*Bruen*, however, rejected the second step: *District of Columbia v. Heller*, 554 U.S. 570 (2008), did not support "applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. Rather, "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id.* at 2131 (simplified). Even if a firearm restriction *could* satisfy an "interest-balancing inquiry," the Supreme Court explained, the "very enumeration of the right takes [it] out of the hands of government." *Id.* at 2129 (simplified).

Having dismissed the second step, *Bruen* provided guidance on conducting the first-step historical analysis. The Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id*. But *Bruen* reminded that "not all history is created equal." *Id*. at 2131–32. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136 (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. Similarly, *post-ratification laws that "are inconsistent with the original meaning of the constitutional text* obviously cannot overcome or alter that text." *Id*. at 2137 (emphasis added).

*Bruen* also offered analytical guidance for evaluating historical clues. In particular, *Bruen* drew a distinction between two types of regulation. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Id.* at 2131. Courts should begin by deciding whether "a distinctly similar historical regulation address[ed] the problem." *Id*. If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id*. Likewise, if

earlier generations rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical regulations and the challenged regulation are "relevantly similar," with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

In either case, the burden falls squarely on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the government cannot do so, the infringement cannot survive.

Employing these tools, *Bruen* concluded that New York's law fell under the first category. It implicated a societal problem dating back to the founding: "handgun violence, primarily in urban areas." *Id.* at 2131 (simplified). Thus, there was no need for analogical reasoning and the government bore the burden to show a "comparable tradition of regulation" from the founding era. *See id.* The government, however, had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. At most, the government had shown restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id.* at 2143. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id.* at 2145, 2154.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

1    • If the government cannot do so, the law is unconstitutional.

2    *Id.* at 2129–30 (quotations omitted). Accordingly, *Bruen* requires courts to revisit any

3    Second Amendment decision not consistent with this methodology.

4    ## 2. *Bruen* abrogated prior case law that relied on "presumptively lawful" exceptions.

5

6    "[W]here intervening Supreme Court authority is clearly irreconcilable" with

7    prior Ninth Circuit authority, "district courts should consider themselves bound by

8    the intervening higher authority and reject the prior opinion of this court as having

9    been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en

10   banc). To determine whether a prior opinion was overruled, courts look not only to

11   "'the holdings of higher courts' decisions'" but also their "'mode of analysis.'" *Id.*

12   (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175,

13   1177 (1989)). Such holdings "need not be identical in order to be controlling" as long

14   as they "undercut the theory or reasoning underlying the prior circuit precedent in

15   such a way that the cases are clearly irreconcilable." *Id.* To the extent prior decisions

16   employ a different and "clearly irreconcilable" "mode of analysis," this Court is

17   "bound by" *Bruen* rather than those decisions. *Id.*

18   *Bruen* is clearly irreconcilable with prior precedent that applied a "means-end

19   scrutiny." *See Chovan*, 735 F.3d at 1134–37. *Bruen* is also irreconcilable with prior

20   precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions

21   automatically controls, absent a full historical analysis. *See United States v. Vongxay*,

22   594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful"

23   language to deny a Second Amendment challenge to § 922(g)(1)); *United States v.*

24   *Potter*, 630 F.3d 1260, 1261 (9th Cir. 2011) (same, for § 924(c)(1)(A)).

25   In *Heller*, the Supreme Court confirmed an individual's right to keep and bear

26   arms but cautioned that this right is "not unlimited." 554 U.S. at 626. As an example,

27   the Court provided a non-exhaustive list of "*presumptively* lawful regulatory

28   measures"—i.e., ones that had not yet undergone a full historical analysis. *Id.* at 627

21cr1590-JLS

2

n.26 (emphasis added). This list included laws restricting possession by felons and the mentally ill and the carrying of firearms in "sensitive places." *Id*. at 626. But it also included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id*. Elsewhere, *Heller* confirmed this historical regulation of concealed-carry laws, pointing to multiple state Supreme Court decisions holding that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id.* at 613, 629.

The Court *Heller* emphasized, however, that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id*. Because that earlier decision was the Court's "first in-depth examination of the Second Amendment," *Heller* explained that it could not "clarify the entire field." *Id*. at 635. *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id*.

That time was fourteen years later, when *Bruen* undertook an "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms. Specifically, New York outlawed open carry and required a showing of "proper cause" before a person could receive a license to "'have and carry concealed' a pistol or revolver." *Bruen*, 142 S. Ct. at 2123 (quoting N.Y. Penal Law § 400.00(2)(f)). While acknowledging *Heller*'s preliminary analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See id*. at 2146–47. With this new understanding, it held that New York could not, in fact, issue a blanket prohibition on concealed carry or even limit it to those with special self-defense needs. *Id*. at 2156.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an

21cr1590-JLS

2

"exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 554 U.S. at 635. *Bruen* shows that *Heller*'s preliminary list of exceptions do not bind future courts or prevent them from conducting a full historical review that may point to a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test—rather than *Heller*'s preliminary take— controls.[1]

This mode of analysis abrogates prior Ninth Circuit case law finding felon-in-possession and possession in furtherance of drug sales laws constitutional.

In *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2009), the Ninth Circuit rejected a Second Amendment challenge to § 922(g)(1) by relying on *Heller*'s "presumptively lawful" language. *Vongxay* then relied on a line of cases that had upheld felon-in-possession laws under the means-end scrutiny of the second step. *Id*. at 1116–18. Because *Bruen* abolished this second step and showed that *Heller*'s list of "presumptively lawful" exceptions are not binding, *Vongxay* is no longer good law.

Similarly, in *United States v.Potter*, 630 F.3d 1260  (9th Cir. 2011), the Ninth Circuit rejected a Second Amendment challenge to § 924(c)(1)(A)'s prohibition on possessing firearms in furtherance of drug trafficking, relying on *Heller*'s "presumptively lawful" and "lawful" language. As a result, *Potter* never, as required by *Bruen*, looked to the Second Amendment's plain text or historical tradition. 142 S. Ct. at 2129–30. Nor did it properly shift the burden to the government to prove

---

[1] *Bruen* also contains references to "law-abiding" individuals. *Id*. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. But like the concealed-carry and felon-in-possession restrictions, *Bruen*'s test requires the government to prove that the plain text of the Second Amendment refers only to "law-abiding" people and a historical tradition exists of denying firearms to non-"law-abiding" people. *Id*. at 2129–30. For the reasons explained here, the government cannot prove either.

21cr1590-JLS

2

relevant historical traditions. *Id.* For the same reasons that *Vongxay* is abrogated, so too is *Potter*.

### B. The Second Amendment's plain text covers Mr. Serrano's conduct.

Mr. Serrano's conduct is "presumptively protect[ed]," *Bruen*, 142 S. Ct. at 2130, because it falls within the Second Amendment's plain text: "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Mr. Serrano is one "of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 580). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting); *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).

Comparison to other constitutional amendments confirms this view. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It is beyond challenge that felons are among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. Const. amend. IV; *see, e.g.*, *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016). And felons likewise enjoy "the right of the people" to "petition the government for redress of grievances." Const. amend. I; *see, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). If a felon is one of "the people" protected by these Amendments, *Heller* teaches that he is one of "the people" under the Second Amendment, too.

Additionally, the Second Amendment's plain text presumptively protects Mr. Serrano's alleged "course of conduct." *Bruen*, 142 S. Ct. at 2134. The Second Amendment's text protects the right "to keep and bear Arms," Const. amend. II—

which means the right "to possess and carry weapons in case of confrontation.'"

*Bruen*, 142 S. Ct. at 2135 (quoting *Heller*, 554 U.S. at 592). Specifically, the right to "bear" arms includes the right to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (simplified). The right to "keep" arms simply "refer[s] to possessing arms, for militiamen and everyone else." *Id.* at 583, 629–30 (simplified).

Because counts one thought four, seven through ten, eleven, and twelve rest solely upon the *possession* of a gun, by a prohibited person, a person in a drug trafficking crime, or the possession of a certain type of gun, the Second Amendment's plain text covers the allegations here.[2] Mr. Serrano's possession of these firearms is "presumptively guarantee[d]"—unless the government meets its burden to prove that 18 U.S.C.§§922(g)(1), 922(k), 924(c)(1)(A), and 26 U.S.C. §§ 5861(d) and 5871 are each "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2134.

### C.     The government cannot show "an American tradition" that individuals convicted of a felony may not possess a gun.

The government cannot meet its burden to establish the requisite historical tradition as to § 922(g)(1). As in *Bruen*, the "general societal problem" that § 922(g)(1) is designed to address—i.e., felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. Thus, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation." *Id.* The government cannot meet its burden to establish § 922(g)(1)'s historical pedigree for a simple reason: neither the federal government nor a single

---

[2] This case does not implicate § 924(c)(1)(A)'s alternative elements, like "use[] . . . [of] a firearm." Whether the Second Amendment's protections on "keep[ing] and bear[ing] arms" extend to using arms is not at issue here. Const. amend. II.

state barred all people convicted of felonies until the 20th century.[3] *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009). The modern version of § 922(g)(1) was adopted *177 years* after the Second Amendment—far too recently to alter its meaning. *Bruen*, 142 S. Ct. at 2154 n.28 ("[L]ate-19th-century evidence" and any "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

The government may argue that, historically, *some* jurisdictions *sometimes* regulated firearm use by those considered *presently* violent. That is not, however, a "distinctly similar historical regulation," *Bruen*, 142 S. Ct. at 2131, for at least three reasons: (1) not all people with a felony conviction are presently violent. (2) the historical regulations required an individualized assessment of a person's threat to society, and (3) the historical regulations almost always allowed people deemed violent to still possess weapons for self-defense. Even those convicted of serious crimes, even rebellion, were entitled to protect themselves, by possessing firearms if necessary. Those targeted laws are a far cry from declaring that any person, convicted of any felony, can *never* possess "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.[4]

### 1. Forever depriving all felons of their right to bear arms does not comport with English history.

England, prior to Independence, did not ban felons from ever again possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall,

---

[3] The first state law to bar the possession of some firearms by felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/.

[4] If such restrictions create ambiguity, ambiguity is insufficient for the government to meet its burden. *Bruen*, 142 S. Ct. at 2139, 2141 n.11. A single state's statute or a "pair of state-court decisions" cannot outweigh "the overwhelming weight of other evidence." *Id*. at 2153.

21cr1590-JLS

2

*Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). To the extent that England sought to disarm various individuals, those regulations usually required a more culpable mental state and made exceptions for self-defense, both features absent from § 922(g)(1). They also did not prohibit possession of guns without serial numbers or those that had not been registered. In other words, they are not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2131

For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). But that offense did not make every person the townspeople found scary a criminal. The common law required that "the crime shall appear to be malo animo, [that is,] with evil intent or malice." *Id.* (quoting *Rex v. Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686)). In other words, the bearer had to have "the intent to cause terror in others." *Id.* at 2183 (Breyer, J., dissenting) (describing majority's view). That is a much more culpable mental state than § 922(g)(1)'s "knowingly." *See* 18 U.S.C. § 924(a)(8).

Second, when England tried to minimize *prospective* use of firearms by those considered dangerous, it was through sureties, not mass disarmament. Marshall, *supra*, at 717. A justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id.* (quoting 5 William Blackstone, *Commentaries* \*386-87 (St. George Tucker ed., 1803) (1767)); *see also* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (citing 1 W. Hawkins, *Pleas of the Crown* 60 (1716); 3 Sir Edward Coke, *Institutes of the Laws of England* 160 (1644)). But unlike § 922(g)(1), surety laws still presumed that a person could have arms. *See Kanter*,

919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; Greenlee, *supra*, at 260. In other words, the regulation targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (sureties not imprisonment). To the extent England sought to disarm whole classes of subjects, it did so on noxious grounds, yet still permitted those targeted to keep arms for self-defense. For example, in the age of William and Mary (both Protestants), Catholics were presumed loyal to James II (the prior Catholic king trying to retake the throne) and treasonous. Catholics could only keep "Arms, Weapons, Gunpowder, [and] Ammunition," if they declared allegiance to the crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12. In other words, even when England presumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994). In short, the English never tried to disarm all felons.[5] Instead, they sought to limit the use of firearms by those

---

[5] *Some* felons could no longer bear arms because (1) they were executed and (2) they forfeited personal property upon a felony conviction. Marshall, *supra*, at 714. Neither practice suggests that the Framers understood the pre-existing Arms right to exclude all felons. *See also infra* 20 (discussing early American punishment of felons). As to execution, England, in fact, let many felons live. Between 1718 and 1769, a scant 15.5% of felons convicted in London's chief criminal court received the death penalty. Javier Bleichmar, *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound For America: The Transportation Of British Convicts To The Colonies* 1718-1775, at 21 (1987)). Execution was even less common in the early United States. *Infra* 20. As to forfeiture, "it did not follow that one could not thereafter purchase and hold new personal property—including a gun." Marshall, *supra*, at 714. More importantly, the Framers tended to "condemn forfeiture of property, a[t] least in cases of felony, as being an unnecessary and hard punishment of the felon's posterity." 2 James Kent, *Commentaries on American Law* 386 (O.W. Holmes, Jr., ed., 12th ed., Little, Brown, & Co. 1873) (1826).

individuals found to be violent and rebellious, yet even those individuals could keep arms for self-defense. That is not a "distinctly similar historical regulation." *Bruen*, 142 S. Ct. at 2131.

### 2. Forever depriving all felons of their right to bear arms does not comport with colonial and Founding-era history.

"[T]here is little evidence of an early American practice of," *Bruen*, 142 S. Ct. at 2142, forever barring all people convicted of a felony from ever again possessing a firearm. That is not surprising; the new Nation had a more permissive approach to firearm regulation than England. *See, e.g.*, Rawle, *supra*, at 126. The early United States accepted that those who committed serious crimes retained a right to defend themselves. That can be seen in the colonies' and states' statutes, early American practice, and state constitutional conventions.

### (a) Founding-era statutes and regulations did not bar felons from possessing firearms.

First, no Founding-era statutes or interpretations of the common law barred all felons from possessing firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Cheste*r, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring).

To the extent that the new Nation sought to disarm classes of people, the regulatory approach was a far cry from § 922(g)(1). For example, the Virginia colony, like England, disarmed Catholics, still viewed as traitors to the crown, who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But there was an exception for weapons allowed by a justice of the peace "for the defense of his house and person." *Id.* And following the Declaration of Independence, Pennsylvania ordered that those who did not pledge

21cr1590-JLS

allegiance to the Commonwealth and renounce British authority be disarmed. *Id.* at 159. Thus, to the extent that either regulation would comply with the First Amendment, as understood today, they required a specific finding that a specific person posed a risk of violence to the state.

Colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. For example, leaders of the seminal Massachusetts Bay colony once disarmed supporters of a banished seditionist. Greenlee, *supra*, at 263 (citations omitted). Nevertheless, "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, after the participants in Shay's Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred from bearing arms, *for three years*. *Id.* at 268–67. In fact, Massachusetts law required the Commonwealth to hold *and then return* the rebels' arms after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893). In other words, one of the first states punished people involved in armed rebellion, one of the most serious violent crimes, with merely a three-year firearm ban and promise to return the weapons used to attack the new government.

### (b)   Proposals from state constitutional conventions are weak evidence, but still were narrower than § 922(g).

If one seeks even debatable "authority before World War I for disabling felons from keeping firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution." *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting) (quoting Marshall, *supra*, at 712). These proposals, if relevant at all, do not demonstrate a historical tradition of regulation akin to § 922(g). *See, e.g.*, *Kanter*, 919 F.3d at 454 (Barrett, J. dissenting); *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting); Marshall, *supra*, at 713; Greenlee, *supra*, at 267; Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009).

As the states' conventions debated ratification, several proposed that the Nation's charter guarantee the right to bear Arms. *Id.*; Greenlee, *supra*, at 265–66; 1 Jonathan Elliott, *The Debates in the Several State Conventions of the Federal Constitution* 328, 335 (2d ed. 1836). Three such proposals included an arguable limitation on that right. First, New Hampshire's convention proposed that citizens not be disarmed "unless such as are or have been in actual rebellion." 1 Elliot, *supra*, at 326. Second, Samuel Adams argued at Massachusetts' convention that "the people of the United States, who are peaceable citizens," should not be deprived of their arms. *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)). Finally, a minority of Pennsylvania delegates—all Antifederalists who opposed ratification[6]—suggested that persons should not be disarmed "unless for crimes committed, or real danger of public injury from individuals." *Id.* at 455 (quoting Schwartz, *supra*, at 662, 665). "[O]nly New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention." *Id.*

As an initial matter, the proposals are an exceptionally weak form of evidence. None made it into the final text. And as *Heller* warns, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590; *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002) (explaining *expressio unius est exclusio alterius*). Furthermore, *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 604. That is because the Second Amendment was "widely understood to

---

[6] As *Heller* noted, it is "highly problematic" to assume that the "the best or most representative reading of" the Second Amendment "would conform to the understanding and concerns of the Antifederalists." *Id.* at 590 n.12.

codify a pre-existing right, rather than to fashion a new one." *Id*. If these proposals really codified previous practice, the government should be able to point to Founding-era laws imposing similar firearms restrictions. Yet no such laws exist.[7]

There is another issue with relying on these proposals: They differ significantly from one another and from other proposals arising from state conventions. The conventions in Rhode Island and New York proposed an unqualified version of the Second Amendment right, "[t]hat the people have a right to keep and bear arms[.]" 1 Elliott, *supra*, at 328, 335. Thus, while three proto-Second-Amendment proposals expressly limited who had the right to bear arms, two did not. Nor did the four state constitutions—including those of Pennsylvania and Massachusetts—that adopted a parallel right to arms before the Second Amendment contain any textual limitation on that right. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). Relying on this drafting history would therefore suggest that "different people of the founding period had vastly different conceptions of the right to keep and bear arms. That simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Heller*, 554 U.S. at 604–05.

Yet even if one assumes that the proposed limitations shed light on the actual Second Amendment, it does not legitimize § 922(g)(1). The former proposed some restrictions on arms for those who engaged in rebellion or violence. The latter bars firearm possession for anyone convicted of a crime punishable by more than a year.

---

[7] Indeed, these proposals contradict early American practice. For example, New Hampshire's "actual rebellion" limitation, *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting), contradicts Massachusetts promise to store and return the firearms of the instigators of Shay's Rebellion after three years. Nor can Samuel Adams and the Pennsylvania minority's proposal to limit arms to the peaceable be squared with early American surety laws that permitted the people "reasonably likely to 'breach the peace'" to still carry guns if they could (1) "prove a special need for self-defense" or (2) "post a bond before publicly carrying a firearm." *Bruen*, 142 S. Ct. at 2148.

These are not close to analogous. *See Marshall*, *supra*, at 713 (concluding that "these three formulations do not support a lifetime ban on any 'felon' possessing any arms"); *Greenlee*, *supra*, at 267 (same); Larson, *supra*, at 1375 (same); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (same); *Folajtar*, 980 F.3d at 915 (3d Cir. 2020) (Bibas, J., dissenting) (same); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (same)..

### (c)      Arguments about execution of felons and "virtuous citizens" do not support § 922(g)'s constitutionality.

The government may argue that two oft-cited American practices, (1) execution of felons and (2) a desire for a virtuous citizenry, show that § 922(g)(1) is nothing new. But as two prominent jurists recently concluded, those arguments lack historical and legal support. *Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 912, 916–21 (Bibas, J., dissenting).

On the first basis, stripping a felons of all rights, including that of life, is irrelevant to the understanding of a constitutional right. Those who have been executed are dead, and therefore cannot possess yet alone use firearms. No limitation of the right of a *living* person to possess a gun existed.

As for virtue, there is no primary source evidence linking the right to possess a firearm to the extraordinarily vague term of "virtuousness." Historians have cited *one another* to support the "virtue" theory, but they have not identified any supporting Founding-era materials beyond the three proposals from state conventions discussed above. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting) (comparing the authorities supporting a virtuousness limitation to a "matryoshka doll"). To the extent that history suggests that the Framers stripped the unvirtuous of certain rights—it was civic rights (such as jury service or voting), not individual rights (such as the freedom of speech). *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 916 (Bibas, J., dissenting). In fact, conditioning the Second Amendment's protections on virtuousness is inconsistent

with *Heller*. *E.g.*, *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). As several Third Circuit judges noted:

> [T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by [scholars] . . . who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a "civic right . . . exercised by citizens, not individuals . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia."

*Binderup*, 836 F.3d at 371 (Hardiman, J., concurring).

In sum, "[t]he Founding generation had no laws limiting gun possession by . . . people convicted of crimes." Winkler, *supra*, at 1563 n.67. That the Framers were aware of such proposals and chose a different path is powerful evidence that such limits on firearm possession are not baked into the Second Amendment.

### 3. Forever depriving all felons of their right to bear arms does not comport with 19th-century history.

American practice and laws during the nineteenth century—before and after the Civil War—also confirms that § 922(g)(1) does not comport with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The United States continued to regulate—but not ban—firearm possession by those feared to be violent. *See Bruen*, 142 U.S. at 2148 (holding that 19th century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond). But, as discussed above, that is not similar to § 922(g)(1). There is no evidence of a precursor to § 922(g)(1)'s broad, class-based ban. In fact, there are at least two documented instances where attempts to disarm a class of offenders were rejected as inconsistent with the right to bear arms.

First, as with Shay's Rebellion, Congress declined to disarm southerners who fought against the Union in the Civil War. *Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004). The reason: some northern and Republican senators feared that doing so "would violate the Second Amendment." *Id.*

Second, when a Texas law disarmed people convicted of unlawfully using a pistol, it was held unconstitutional. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (1878). The state's highest court in criminal cases at the time held:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, *but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms*. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. *One of his most sacred rights is that of having arms for his own defence and that of the State*.

*Id.* at 300–01 (emphases added).

Although *Jennings* interpreted Texas's constitution, not the Second Amendment, its analysis is indicative of how firmly states believed that everyone had a fundamental, preexisting right to own firearms for self-defense—even those who had misused firearms in the past. *Jennings*' setting is notable. As *Bruen* held, 1870s Texas imposed and upheld unusually strict firearms regulations. 142 S. Ct. at 2153. In sum, 19th century history provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional. Not only was there a consistent practice of allowing people who broke the law to keep weapons for self-defense—at least one state appellate court and Congress also agreed that disarming lawbreakers was unconstitutional. As *Bruen* teaches: "[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131. Because laws disarming anyone convicted of a felony did not appear until the 1900s, they are not relevant here. 142 S. Ct. at 2154 n.28.

### D.   The Government cannot show an "American tradition" of banning categories of firearms based upon serial numbers and registration

Counts eleven and twelve charge a violation of possessing an unregistered firearm and one with an obliterated serial number. At the time of the adoption of the

21cr1590-JLS

2

Second Amendment, few if any guns were registered or marked for identification. A regulatory ban of possession firearms without a serial number or one that has not been registered, especially when the firearm was possessed in Mr. Serrano's home as part of his right to defend his dwelling, would not survive the Second Amendment.

### E. The government cannot show "an American tradition" of criminalizing gun possession during illicit commercial activity.

The government also cannot meet its burden to establish a historical tradition similar to § 924(c)(1)(A)'s prohibition on possessing firearms in furtherance of drug sales. As in *Bruen*, the "general societal problem" that this part of § 924(c)(1)(A) addresses is not new. *Id.* at 2131. Arms possession in furtherance of and identified illegal commercial activity, such as smuggling, gambling, or selling banned substances like alcohol or drugs, "has persisted since the 18th century*." Id.*

Despite that, there is little evidence of an early American practice" of criminalizing weapon possession in furtherance of drug sales, or any other "distinctly similar" illegal commercial activity. *See Bruen*, 142 S. Ct. at 2142 (articulating standard). Instead, English law prior to independence, founding-era law, and early and mid-nineteenth century legislatures "addressed the societal problem . . . through materially different means." *Id.* at 2131. Increased penalties for possession of firearms in furtherance of crimes were "not widely found" in the United States until the twentieth century. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Problems 55, 80 (2017).

The offense charged here is modern. Section 924(c) was enacted in 1968, and first prohibited using or carrying firearms for drug trafficking in 1970. *United States v. Melville*, 309 F. Supp. 774, 776 (S.D.N.Y. 1970); *see also Gonzales v. Raich*, 545 U.S. 1, 10–15 (2005). It first encompassed possession offenses in 1998. *See United States v. O'Brien*, 560 U.S. 218, 232–33 (2010). As with felon in possession laws, this is far too late to alter the Second Amendment's meaning.

There is also little to indicate that English common law and the Founding era criminalized weapon possession in furtherance of activities like drug sales. *See, e.g.*, Malcolm, *To Keep and Bear Arms* at 1–134; Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502–17 (2004) (each comprehensively reviewing gun regulations, and none mentioning such regulations or prohibitions). In a "vast newly compiled dataset of historical gun laws" in pre-Civil-War America, an academic found only one state and two territories that had *any* sentence enhancement for use of a gun during *any* crime, violent or nonviolent. Spitzer, *Gun Law History* at 56, 60. Added penalties for use of guns may feel like an "old idea," but it was "not one widely found during the period under study," i.e., between the 1600s and the very early 1900s. *Id.* at 80.

Instead, in England and Founding-era America, lawmakers regulated commercial outlaws' arms possession in two fundamentally different ways. English common law criminalized the public carry and use of common weapons by focusing not on the *underlying crime* but on *intent to cause fear or violence* specifically. The common law criminalized publicly carrying firearms only when someone intended to carry the weapon for terror or violence. Indeed, as explained above, *see supra* section C.1 and C.2, English common law historically prohibited only carrying a weapon with intent to "terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141–42; *see, e.g.*, Malcolm, *To Keep and Bear Arms* at 105 (discussing the Statute of Northampton).

Colonial America and the Founding era did nothing more than "codif[y] th[is] existing common-law offense of bearing arms to terrorize the people." *Bruen*, 2143. Then, in the early and mid-nineteenth century, the few American entities that criminalized possessing a dangerous weapon while committing another crime did so only for crimes widely considered violent, similar to the inherently violent felonies underlying the doctrine of felony murder. *See* Spitzer,

*Gun Law History* at 80 ns. 172–75 (identifying enhancements for possessing a dangerous weapon during a robbery or burglary in Connecticut, territorial Ohio, and territorial Washington).

Second, England and Founding-era America addressed the social problem of weapons use during illegal activity by wholesale criminalizing *types* of weapons thought to be commonly used by dangerous people. *Heller*, 554 U.S. at 627; *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam). For example, in response to "acute disorder" from "bands of malefactors . . . committing assaults and murders" across England, the Statute of Northampton prohibited public carry of particular weapons and armor. *Bruen* at 2139–40. Those specific arms, "launcegays" and other lances, were "carried only when one intended to engage in lawful combat or . . . breach the peace," so banning them from public carry entirely was acceptable. *Id.* at 2140. By contrast, daggers were used for self-defense by "almost everyone"—and so were not prohibited. *Id.*

Similarly, in the early and mid-nineteenth century, state legislatures did not criminalize possessing *any* weapon while engaging in commercial crimes (like illegally selling alcohol, running a gambling house, or engaging in prostitution). People engaging in those crimes, like felons, still had the right to possess common weapons for self-defense. *See* section C.1 and C.2, *supra*.

Instead, a few states and territories criminalized possession of certain types weapons thought to be used for "fighting," or those "favored by 'assassins' and 'ruffians.'" David B. Kopel *et al.*, *Knives and the Second Amendment*, 47 U. Mich. J. of L. Reform 167, 180, 186 (2013) (quoting *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840)). For example, Bowie knives and "Arkansas toothpicks" were two prominently outlawed arms at that time. *Id.* Other similar outlawed arms included "dirks, daggers, slungshots, sword-canes, [and] brass-knuckles." *Id.* at 188; *see also* Cornell & DeDino, *A Well Regulated Right* at 517 (noting that some states prohibited "the sale of particular classes of weapons" around this

period). *Heller* recognized this historical tradition of banning certain weapons associated with outlaws, i.e., "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." 554 U.S. at 625.

In sum, concerned about potential criminals with guns, both England and early America carefully navigated around their citizens' gun rights. In so doing, they criminalized both the carrying of weapons to terrify others and the possession of weapons that weren't commonly used for self-defense. But neither adopted anything "distinctly similar" to § 942(c)(1)(A)'s prohibition on gun possession in furtherance of a drug crime. *Bruen*, 142 S. Ct. at 2131.

## IV.    Conclusion

Mr. Serrano is charged with possessing a firearm as a felon, possession of a firearm in furtherance of drug trafficking, possession of a firearm with an obliterated serial number, and possession of an unregistered firearm. Because the government cannot "meet [its] burden to identify an American tradition" that prohibited people with felonies or engaging in illicit commercial activity from possessing firearms, or prohibited possession of an unregistered firearm or one with an obliterated serial number, these offenses are unconstitutional. *Bruen*, 142 S. Ct. at 2138. At a minimum, the government must present evidence of a historical tradition that would have prohibited a person in Mr.Serrano's circumstances from possessing a firearm in his home. If it cannot, the Court must dismiss counts 1-4, 7-10, and 11-12.

 Dated:  October 18, 2022

Respectfully submitted,

*John Lanahan*
*Attorney for Jose Serrano*

21cr1590-JLS

2