RANDY S. GROSSMAN
United States Attorney
CONNIE V. WU (#297177)
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8592
Connie.Wu@usdoj.gov

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 21-cr-1590-JLS |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS** |
| v. | |
| JOSE ANGEL SERRANO, a.k.a. "El Joey," | Date: November 1, 2022
Time: 9:00 a.m.
The Hon. Janis L. Sammartino |
| Defendant. | |

The United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Connie V. Wu, Assistant United States Attorney, hereby files its response in opposition to Defendant's above-captioned motion. This response in opposition is based upon the files and records of the case, together with the attached statement of facts and memorandum of points and authorities.

//
//
//
//
//
//
//

# I.

# STATEMENT OF RELEVANT FACTS[1]

On Monday, March 15, 2021, the Chula Vista Police Department responded to a call on Fernwood Road in Chula Vista that the Defendant, Jose Angel Serrano, drugged and forcibly raped and sodomized his 14-year-old stepdaughter, MV1. Defendant lived at the Fernwood residence with his wife ("Defendant's wife"), her daughters (including MV1), and a renter, Ms. Beltran. Defendant was not present when police initially responded to the call, and the police were invited into the residence by Defendant's wife and Ms. Beltran. The Fernwood residence is a two-story house comprised of three upstairs bedrooms, a downstairs bedroom, a downstairs kitchen and family room, and an upstairs family room. Additionally, the house had a garage attached to the family room by a hallway, an attic only accessed from the upstairs bedroom closet, and a downstairs bedroom in which Ms. Beltran occupied through a separate entrance.

The police arrived at the residence at 1:00 pm, where they were met by Defendant's wife, two of her daughters, and Ms. Beltran. The police did not have a warrant at the time, but Defendant's wife asked them to come inside and investigate their allegation that Defendant had raped her daughter, MV1. This allegation was proven by a rape kit using DNA Defendant voluntarily provided, the results of which were provided in discovery. Furthermore, Defendant left a hickey on her neck, which was also documented in discovery.

MV1 told the police that on the night of the rape, Defendant had given her alcohol and made her do drugs. **D2 R2 at 0:26-40.** He introduced her to cocaine for the first time by putting it up her nose, having her sniff it, and then having her snort another three lines

---

[1] As directed by the Court, the United States will play relevant portions of the body-worn camera (BWC) footage at the November 1, 2022 evidentiary hearing rather than submit voluminous video footage for the Court to peruse. The United States intends to play the BWC referenced in **bold** in support of its response in opposition at the hearing, along with any other requested video.

of cocaine from a rolled up piece of paper off a mirror in the master bathroom. *Id*. at **01:17-01:37.**

While inside, the police interviewed the visibly anguished family and MV1, who demonstrated obvious signs of physical injury resulting from the forcible rape that had occurred the night prior. Family members led police officers throughout the house to show them the areas of the house in which the assault had occurred. *See* D1 R3. While in the master bedroom, Defendant's wife pulled out multiple firearms Defendant maintained in the bedroom dress and placed them on the bed for the officers to see. With assistance from the family pulling out several of the items, police found a ghost gun, ammunition, armor piercing ammunition, air rifles, firearm parts, and body armor. *See* D1 R3 09:15-24:30; *see also* D3 R12. While some officers were searching the upstairs master bedroom, others were also interviewing MV1, Defendant's wife, Defendant's wife's other daughter, and Ms. Beltran.

After interviewing Defendant's wife, her other daughter and Defendant's wife unlocked the door to the garage and showed police a locked tool drawer. *See* D3 R4. The police found what appeared to be a "pay-owe" list, and Defendant's wife's daughter informed the police that there were drugs inside of the locked tool cabinet, including cocaine and a "bag of pills" that she gestured with her hands to be a medium-sized bag about a foot long and a foot wide. ***See* D3 R15 at 0:30-2:00**. Before she was able to locate the keys to the drawer, Defendant's step daughter asked the officer if he could break open the locked container. An officer informed them, "Unfortunately, I can't break it." ***Id*. at 1:09**. Defendant's step daughter asked, "What if I break it?" ***Id*. at 1:11**. The officer replied, "That's your decision. It's your home…If you guys want to break it, I can't tell you *not* to; I can't tell you to…it's up to you…I can't physically do anything about it." ***Id*. at 1:11-1:34.**

In response to Defendant's wife and her daughter's claim that the locked tool cabinet contained cocaine (which is the drug MV1 stated Defendant forced her to use), an

3

officer peered into the cracks of the tool cabinet with a flashlight, but without manipulating, pulling, or prying the container open. **D3 R15 at 0:25- 1:21**.

Upon learning that Defendant would not be arrested for rape at that time, the family became extremely emotionally distraught, and Defendant's wife stated that she was also accusing him of being a drug trafficker. She asked the officer, "Can you at least see what is in the garage?" **D2 R25 at 6:09.** The police responded, "Sure, do you want to show me?" *Id*. **at 06:12.** Defendant's wife led officers back into the garage and opened the locked tool cabinet with the key she had since located. *Id.* **at 06:39-09:15.** She proceeded to show officers the contents of the locked tool cabinet drawer by pulling the drawer all the way open and pulling items out of the drawer for the officers to get a better look at without the officers ever uttering a word of instruction or hint at what they wanted her to manipulate in the tool cabinet. *Id.* During this entire cited video segment, the officer standing closest to the tool cabinet containing significant drug-related contraband maintained one hand on his flashlight to shine a light on the items Defendant's wife placed in his plain sight and his other hand in his back pocket.

At one point, police were notified of Defendant's vehicle approaching the Fernwood house. Multiple family members informed Chula Vista Police that Defendant is armed with a gun and carries it tucked in the back of his pants, thus police took the precaution of handcuffing and detaining Defendant after he pulled onto the street.

Defendant was taken to a police car where he was interviewed by police. *See* D1 R36. Defendant spent only a short period of time in handcuffs before he was uncuffed and told he was not going to be arrested, but there would be a temporary restraining order keeping Defendant from entering the Fernwood house. *Id*. Officers explained to Defendant that he had been accused of sexual assault but did not say by whom. Defendant freely gave a DNA test while he was uncuffed. *See* D1 R36 at 11:00.

An officer told Defendant, "If you're willing to give us your DNA to rule you out, that would be fantastic. We can't force you. You're not under arrest at this point, so you have every right to say no and tell us to go to hell," to which Defendant responded, "Of

course I would…I'll give DNA." **D1 R36 at 9:55-10:07**. While doing a protective sweep to ensure there was not a gun in Defendant's car as reported by his family members, officers found $15,000 in U.S. currency, but did not find a gun in his possession.

The search of the tool cabinet initiated and enabled by Defendant's wife confirmed her and and her daughter's allegation that it contained illegal drugs, including the cocaine and M-30 pills that they stated would be there in addition to other evidence and contraband. *See* D2 R29. Likewise, there was a small black bag that Defendant's wife had pulled out for officers to look at that also contained methamphetamine. After discovering the assortment of drugs, police arrested Defendant for possession of controlled substances for sale, in violation of California Health and Safety Code § 11378(f).

## II.

## ARGUMENT

**A. Defendant's wife and step daughter possessed common authority over the garage and lawfully consented to its search.**

The Supreme Court in *Illinois v. Rodriguez,* stated "a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). In determining when a third-party has common authority, the Supreme Court in *United States v. Matlock*, stated that a third-party has common authority over an area when they "ha[ve] joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Furthermore, the Court reasoned that "common authority" may serve as the basis for a valid third-party consent because such authority makes it "reasonable to recognize that . . . [the other occupants] have assumed the risk that one of their number might permit the common area to be searched. *Id*.

Defense argues that Serrano's garage is a "special and private place within the joint residence." ECF 40-1 at 9. Ordinarily, third parties do not have the authority to consent to private areas in which they have strictly limited access. In *United States v. Dearing*, a non-

relative cohabitant granted consent to the ATF to search the defendant's bedroom, which the court describes as a "special and private place." 9 F.3d 1428, 1429 (9th Cir. 1993). The court in *Dearing* recognized that a third party's access to an area does not automatically give them authority to consent and subsequently rejected the cohabitants authority because "[t]he mere fact of access, without more, does not indicate that the access was authorized." *Id*. at 1430. However, unlike *Dearing*, in the present case, there *is* more.

      Defendant's wife is not just any third party; she has a level of authority over the home and all shared spaces. Furthermore, Defendant's wife and step daughter demonstrated to the officers common access and control to the garage through the following facts: (1) household members had access to the key, which they used to invite them into the garage; (2) one of Defendant's step daughters opened the refrigerator located in the garage containing food for the household while she was rummaging for a snack in the presence of multiple officers (*see* D3 R15 at 0:44) demonstrating the refrigerator was located in a common area and accessed by family members other than Defendant; (3) Defendant's wife and step daughter demonstrated to officers they were familiar enough with the garage to know the precise location within the locked tool cabinet where Defendant kept his drugs. *See* D3 R4 and D3 15. Although it is true Defendant's wife told officers that most of the items in the garage belonged to the Defendant, she did tell officers she did not go in there very much "unless we're working on house projects." **D3 R15 at 05:24-05:35.** Both Defendant's wife and step daughter demonstrated and articulated their common authority over the garage despite acknowledging Defendant as the dominant user.

      In *United States v. Tando*, a mother granted permission to search a defendant's bedroom, a very special and private place, primarily or only used by the defendant. 68 F. App'x 85, 86 (9th Cir. 2003). *Tando* established that a third party can provide consent to search a private area like a bedroom when the third party has joint access and is a close family member living in the home. *Id*. Like in *Tando*, as the matriarch of the household and the Defendant's step daughter certainly had common authority or a "sufficient

relationship to the premises to be inspected" to consent to its search. *United States v. Matlock*, 415 U.S. at, 171 (1974). Therefore, the entry and search of the garage was not unlawful because Defendant's wife and step daughter had common authority over the garage and thus could consent to its search.

**B. The Fourth Amendment does not protect Defendant against searches conducted by other members of the household that are not acting as government agents.**

"It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). In *Jacobsen*, employees of a private freight carrier ('FedEx') noticed a "white powdery substance" that was "originally concealed within eight layers of wrappings." *Id.* at 111. Upon finding the substance, the private FedEx employees pursuant to company policy cut open the packaging exposing four zip-lock plastic bags, at which point the employees called the Drug Enforcement Administration. *Id.* When the first DEA agent arrived, he saw that one tube had been slit open, and the agent removed four other plastic bags from inside the packing and saw the white powder. *Id.* The agent then performed a field test identifying the substance as cocaine. *Id.* at 112.

The facts are not in dispute, but the Supreme Court addressed the question of whether a warrant was required for a search, when the item searched was opened and displayed by a private individual to Government actors. *Id.* at 112-13. At the outset the Court emphasized that, "This Court has also consistently construed [Fourth Amendment] protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Id.* at 113-14 (internal quotation and citation omitted).

The Supreme Court made clear that whether the invasions by the private agents were "accidental or deliberate, and whether they were reasonable or unreasonable, they

did not violate the Fourth Amendment because of their private character." *Id.* at 115. The Court reasoned that after the frustration of original privacy occurs, "the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Id.* at 117. Lastly, even if the white powder was not in "plain view," there was virtual certainty that nothing else was in the package and its content would not tell agents more than they already knew from what "the private party had made freely available." *Id.* at 119-20. Since it was apparent it contained contraband and little else, and the private employees on their own accord, invited agents to examine the contents, the Fourth Amendment did not apply to the search and subsequent seizure. *Id.*

      Here, since Defendant's wife and step-daughter invited Chula Vista Police Officers into their home, told them Defendant was a rapist and a drug trafficker, told officers about the drugs locked in the tool cabinet, and then voluntarily unlocked the tool cabinet and removed its contents for the express purpose of showing them all the illegal drugs and contraband contained within, the Fourth Amendment does not afford Defendant any protection from the search effected by private citizens that were not acting as government agents in any capacity. Similar to the summoning of DEA agents in *Jacobsen*, Defendant's wife summoned Chula Vista Police Officers into her house to investigate MV1's rape and then told them Defndant was a drug trafficker when she believed they were going to release him without arrest.

      It is inconceivable to argue that Defendant's wife or step daughter acted as agents of the officers in this case based on the the videotaped exchange between the parties. Defendant's wife led officers into the garage and noted that the keys were gone and the tool cabinet drawer was locked as she pulled on it, which was unusual. **D3 R15 at 00:30-1:08.** An officer informed the Defendant's wife, "Unfortunately, I can't break it." *Id.* at **1:09.** Defendant's step daughter asked, "What if I break it?" *Id.* at **1:11.** The officer replied, "That's your decision. It's your home…If you guys want to break it, I can't tell you not to; I can't tell you to…it's up to you…I can't physically do anything about it. **Id. at 1:11-1:34.** Defendant's wife later brought officers back to the garage, opened the

8

locked tool cabinet with a key she had located and proceeded to open a locked drawer and pull out all of its contents to display to officers. With one hand on his flashlight and the other in his pocket behind his back, the officer did not ask or encourage her to do anything one way or the other. Indeed, the Supreme Court clearly held that the Fourth Amendment does not protect circumstances where a private party exposes another's private information, irrespective of the deliberateness of the action. *Jacobsen*, 466 U.S. at 117. Thus, Defendant's wife's motive for opening the locked drawer and exposing the drugs – even if it was to facilitate Defendant's arrest – is of no legal consequence because the Fourth Amendment is intended to protect citizens against government intrusions, not private ones.

### III.
### CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant's motion to suppress be denied on all grounds.

Dated:        October 25, 2022            RANDY S. GROSSMAN
                                          United States Attorney

                                          s/ Connie V. Wu
                                          CONNIE V. WU
                                          Assistant United States Attorney

9