RANDY S. GROSSMAN
United States Attorney
CONNIE V. WU (#297177)
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8592
Connie.Wu@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>      v.<br><br>JOSE ANGEL SERRANO,<br>      a.ka. "El Joey,"<br><br>             Defendant. | Case No.: 21-cr-1590-JLS<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>The Honorable Janis L. Sammartino<br>Date: November 1, 2022<br>Time: 9:00 a.m. |

The United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Connie V. Wu, Assistant United States Attorney, hereby files its response in opposition to Defendant's above-captioned motion. This response in opposition is based upon the files and records of the case, together with the attached statement of facts and memorandum of points and authorities.

## I.

## <u>INTRODUCTION</u>

The Second Amendment recognizes "the right of the people to keep and bear Arms" and says the right "shall not be infringed." U.S. Const. amend II. Yet that right "is not unlimited," *D.C. v. Heller*, 554 U.S. 570, 626 (2008), and the Second Amendment is not "a regulatory straightjacket," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.

2111, 2133 (2022). Thus, while the Supreme Court has struck down some restrictions, it has stressed that its decisions apply to "law-abiding, responsible citizens" and do not "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626, 635. Consistent with that understanding, the Ninth Circuit—and others—have held many times that "felons are categorically different from the individuals who have a fundamental right to bear arms" and "that § 922(g)(1) does not violate the Second Amendment." *United States v. Vongxay*, 594 F.3d 1111, 1115, 1118 (9th Cir. 2010).

Defendant says *Bruen* upended all that precedent and requires this Court to conclude that the laws barring possession of guns by felons is unconstitutional. On the contrary, *Bruen* supports applying the precedent affirming those laws. *Bruen* described the rights at issue as those of "law-abiding citizens" more than a dozen times, and even said it did not call into doubt laws designed to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). The Court also reaffirmed *Miller* and the propriety of banning dangerous and unusual weapons. *See id.* at 2128. In a concurrence, Justice Alito stressed that "[o]ur holding decides nothing about who may lawfully possess a firearm" or "the kinds of weapons that people may possess" and does not "disturb[] anything that we said in *Heller* or *McDonald*." *Id.* at 2157 (Alito, J., concurring). Justice Kavanaugh also reiterated that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and reaffirmed *Miller* and the "dangerous and unusual weapon" rule. *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27). Given all that, Defendant's reliance on *Bruen* is simply misplaced. The Court should thus deny his motion to dismiss and conclude that the felon-in-possession law is constitutional.

//

//

//

//

## II.

## STATEMENT OF FACTS

**A.    Defendant was arrested for distribution quantity of drugs and illegal possession of firearms during a police investigation into his forcible rape of his MV1.**

On Monday, March 15, 2021, the Chula Vista Police Department responded to a call on Fernwood Road in Chula Vista that the Defendant, Jose Angel Serrano, plied his 14-year-old stepdaughter, MV1, with alcohol and several lines of cocaine and then then forcibly raped and sodomized her. During the search of the family residence, police located significant amounts of cocaine, M-30 pills, methamphetamine, a Springfield, model XD45, .45 ACP caliber pistol, bearing serial number US60713; a Samozaryadny Karabin sistemy Simonova (SKS), 7.62mm caliber rifle; a Marlin, .30-30 Winchester caliber lever action rifle, bearing an obliterated serial number; a F1 Firearms, model AR, .223 Remington caliber rifle, bearing serial number 110-01197; and a silencer, along with other firearm parts and ammunition. Defendant has since pled guilty in state court to the rape-related charges.

**B.    Defendant's felony criminal convictions.**

| DATE | COURT OF CONVICTION | CHARGE | TERM OF IMPRISONMENT |
|------|---------------------|--------|----------------------|
| 12/16/1991 | CASC | 11383(C)(1) HS-POSS EPH/ETC:INT:MFG METH/ETC | 7 years prison 4 months prison (consecutive) |
| 10/26/2005 | CASC | Felon in Possession of a Firearm | 2 years prison |
| 12/16/2012 | CASC | Conspiracy to Distribute Ecstasy | 92 months prison |

**C.    Relevant procedural history.**

On May 27, 2021, Defendant was charged via Information with Counts 1-4:18 U.S.C. § 922(g)(1) - Felon in Possession of Firearms; Count 5: 21 U.S.C. § 841(a)(1) –

Possession of Methamphetamine with Intent to Distribute; Count 6: 21 U.S.C. § 841(a)(1) – Possession of Cocaine with Intent to Distribute; Counts 7-10: 18 U.S.C. § 924(c)(1)(A)(i) – Possession of a Firearm in Furtherance of a Drug Trafficking Crime; Count 11: Title 18 U.S.C. § 922(k) – Possession of Firearm with Obliterated Serial Number; Count 12: Title 26, U.S.C., §§ 5861(d) and 5871 – Possession of an Unregistered Firearm. ECF 17. On October 18, 2022, Defendant a motion dismiss the under the Second Amendment. ECF 49. The Government hereby files its response in opposition to Defendant's motion to dismiss under *Bruen.*

### III.

### ARGUMENT

**A.   The felon-in-possession law is constitutional.**

The Supreme Court has held that the Second Amendment confers an individual right to keep and bear arms inside and outside the home. Yet in doing so, the Court has repeatedly described the rights at issue as those of "law-abiding citizens" and has even identified felon-in-possession laws as "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26. Consistent with those statements, the Ninth Circuit and every other circuit have repeatedly upheld § 922(g)(1) against Second Amendment challenges. *Bruen* is not "clearly irreconcilable" with that precedent, and in fact supports applying it here. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), *overruled on other grounds by Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021). Historical evidence, as interpreted by various courts, leads to the same conclusion. The Court should thus reject Defendant's challenge to § 922(g)(1).

> *1.   Supreme Court precedent undermines Defendant's argument that the felon-in-possession law violates the Second Amendment.*

The Supreme Court's statements about the rights of "law-abiding citizens" and identification of felon-in-possession laws as "presumptively lawful," the Ninth Circuit's interpretation of those statements, and related precedent from the Supreme Court all undermine Defendant's argument that § 922(g)(1) is unconstitutional.

4

### a. *Heller*.

In *Heller*, the Court held "that the Second Amendment conferred an individual right to keep and bear arms" and that D.C.'s "ban on handgun possession in the home" and on "rendering any lawful firearm in the home operable for the purpose of immediate self-defense" violated that right. 554 U.S. at 595, 635. But in reaching that conclusion, the Court referenced gun possession "by law-abiding citizens." *Id.* at 625, 635; *see also id.* at 644 (Stevens, J., dissenting) ("the Court limits the protected class to 'law-abiding, responsible citizens'"). Elsewhere, it said expressly that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court described as "presumptively lawful regulatory measures." *Id.* at 626 & n.26. In *McDonald v. City of Chicago*, which held that the Second Amendment applies to the States, the Court reiterated that statement: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill[.]' . . . We repeat th[at] assurance[] here." 561 U.S. 742, 786 (2010) (plurality opinion).

Even if those repeated statements were *dicta*, the Ninth Circuit has stated that Supreme Court *dicta* commands "deference" and may not be "lightly" discarded. *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc). Yet the Ninth Circuit has in fact rejected the argument that the statements were *dicta*. In *Vongxay*, after quoting the *Heller* language about felon-in-possession laws, the Ninth Circuit stated, "Vongxay . . . contends that the Court's language about certain long-standing restrictions on gun possession is dicta, and therefore not binding. We disagree. Courts often limit the scope of their holdings, and such limitations are integral to those holdings." 594 F.3d at 1115. Other courts have reached similar conclusions. *See United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *Binderup v. Att'y*, 836 F.3d 336, 359 n.3 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgment); *see also Heller v. D.C.*, 670 F.3d 1244, 1273, 1278 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) (*Heller* "affirmatively *approved*" and "prospectively approve[d] the

constitutionality of several kinds of gun laws," including "felon-in-possession laws," based on "text, history, and tradition"). "Based on this language," the Ninth Circuit concluded "that 'felons are categorically different from the individuals who have a fundamental right to bear arms'" and "upheld 18 U.S.C. § 922(g)(1) against a Second Amendment challenge." *United States v. Phillips*, 827 F.3d 1171, 1173-74 (9th Cir. 2016) (quoting *Vongxay*, 827 F.3d at 1115).

### b. *Bruen*.

*Bruen* did not undermine any of that. Instead, it bolstered those earlier decisions. In *Bruen*, the Court applied "[t]he test we set forth in *Heller*" but made it "more explicit." 142 S. Ct. at 2131, 2134. It clarified "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. In that case, a regulation is valid if the government shows "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *see also id.* at 2133 (noting that government must "identify a well-established and representative historical *analogue*, not a historical *twin*"). The Court noted that circuit courts, while applying a similar test as a "first step," had also applied a "means-end scrutiny" "second step." *Id.* at 2125-27. The Court concluded that the first step in that "predominant framework is broadly consistent with *Heller*" but deemed the second step "one step too many" and rejected it. *Id.* at 2127. Applying the clarified test, the Court held that the Second Amendment protects the "right to carry a handgun for self-defense outside the home" and that a law "condition[ing] issuance of a license to carry on a citizen's showing of some additional special need" violated that right. *Id.* at 2122.

In reaching those conclusions, the Court never discussed felon-in-possession laws or called into question its prior statements about them. That is reason enough to keep applying the Supreme Court decisions (and this Court's cases interpreting them) that *do* touch on the issue. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other lines of decisions, the Court of Appeals should follow the case which directly

1  controls, leaving to this Court the prerogative of overruling its own decisions" (citation

2  omitted)); *Musladin v. Lamarque*, 555 F.3d 830, 837 (9th Cir. 2009) (court must followed

3  "on point" Supreme Court decisions even if "subsequent decisions cast strong doubt on"

4  them).

5  But *Bruen* actually *reinforces* earlier conclusions about felon-in-possession laws. It

6  described the gun rights at issue—as well as the rights at issue in *Heller* and *McDonald*—

7  as the rights of "ordinary, law-abiding citizens." *Bruen*, 142 S. Ct. at 2122. Indeed, the

8  Court used the term "law-abiding" 14 times in the opinion. *Id.* at 2122, 2125, 2131, 2133-

9  34, 2135 n.8, 2138 & n.9, 2150, 2156. It also noted that "nothing in our analysis should

10  be interpreted to suggest the unconstitutionality" of licensing regimes that "require

11  applicants to undergo a background check" to "ensure only that those bearing arms in the

12  jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting

13  *Heller*, 554 U.S. at 635). Consistent with that framing, Justice Alito noted in a concurrence

14  that "[o]ur holding decides nothing about who may lawfully possess a firearm" and does

15  not "disturb[] anything that we said in *Heller* or *McDonald*." *Id.* at 2157 (Alito, J.,

16  concurring). Justice Kavanaugh, joined by Chief Justice Roberts, likewise reiterated in a

17  concurrence that "[n]othing in our opinion should be taken to cast doubt on longstanding

18  prohibitions on the possession of firearms by felons," which are "presumptively lawful

19  regulatory measures." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S.

20  at 626 & n.26).

21  Despite discussing *Bruen* at length, Defendant has little to say about any of that. He

22  does not address *Bruen*'s statement about licensing regimes it did not affect. Nor does he

23  address the assurances in the concurring opinions. And his only response to the opinion's

24  repeated use of the term "law-abiding citizens" appears once. He argues that "*Bruen*'s test

25  would require the government to prove that the plain text of the Second Amendment refers

26  only to 'law-abiding' people and a historical tradition exists of denying firearms to non-

27  'law-abiding' people." Dkt. 29 at 6. In essence, Defendant concedes that the language

28  harms his challenge to § 922(g)(1) but invites this Court to ignore—or second-guess—the

7

Supreme Court's repeated use of that qualifier unless the government can prove that the Supreme Court meant what it said. This Court should decline that invitation.

The Court should likewise decline Defendant's invitation to rely on *Bruen*'s statements about concealed-carry laws as a reason to reconsider prior conclusions about felon-in-possession laws. In Defendant view, *Bruen* concluded that a prohibition *Heller* identified as "longstanding"—bans on concealed carry—was in fact not supported by history. *Id.* at 13. Thus, he reasons, since felon-in-possession laws were also on *Heller*'s list of longstanding prohibitions, the Court should consider those laws anew and conclude that *Bruen* "abrogate[d]" cases relying on *Heller*'s language in any way to uphold felon-in-possession laws. *Id.* at 14. Both conclusions are wrong. First, *Bruen* and *Heller* reached the same conclusion about concealed-carry laws. *Heller* suggested that "prohibitions on carrying concealed weapons were lawful." 554 U.S. at 626. *Bruen*, likewise, indicated that "States could lawfully eliminate . . . concealed carry." 142 S. Ct. at 2150. Second, regardless, *Bruen*'s conclusions about concealed-carry laws lead to few conclusions about felon-in-possession laws and prior precedent discussing felon-in-possession laws.

In sum, given *Bruen*'s confirmation that it was "apply[ing]" *Heller* (not altering it), its consistent focus on "law-abiding citizens" and clarification that it did not undermine licensing regimes ensuring that gun owners are law-abiding, and the concurrences' assurances that nothing in the opinion affected *Heller* or cast doubt on felon-in-possession laws, the opinion is fully consistent with *Heller*'s statements about felon-in-possession laws and prior Ninth Circuit precedent interpreting those statements.

### c. Other Precedent.

Other precedent indicates that there is nothing unusual about the Supreme Court's conclusions about felon-in-possession laws. The Court has confirmed that legislatures may bar or restrict at least some rights of felons. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (right to hold public office); *Jones v. Helms*, 452 U.S. 412, 419-20 (1981) (right to travel); *Richardson v. Ramirez*, 418 U.S. 24, 54-56 (1974) (right to vote). And, more generally, it has upheld categorical limits on other constitutional rights. "Think of the First

Amendment, which has long had categorical limits: obscenity, defamation, incitement to crime, and others." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (citing *United States v. Stevens*, 559 U.S. 460, 468 (2010)). In short, then, various precedents from the Supreme Court support the conclusion that the felon-in-possession law does not violate the Second Amendment right to keep and bear arms.

### 2. *Ninth Circuit precedent forecloses Defendant's argument.*

If Supreme Court precedent does not settle the issue, Ninth Circuit precedent certainly does. Indeed, the Court has held in many published cases—including those cited above and others—that the felon-in-possession law does not violate the Second Amendment. *See Phillips*, 827 F.3d at 1173-74 ("we . . . affirm the district court's denial of Phillip's motion to dismiss the indictment" "(for felon in possession) on Second Amendment grounds"); *Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014) ("§ 922(g)(1) continues to pass constitutional muster"); *Vongxay*, 594 F.3d at 1118 ("§ 922(g)(1) does not violate the Second Amendment as it applies to Vongxay, a convicted felon"); *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005) ("defendant's Second Amendment challenge to the constitutionality of § 922(g)[(1)] is without merit"); *cf. Fisher v. Kealoha*, 855 F.3d 1067, 1071 (9th Cir. 2017) (upholding § 922(g)(9), which bars gun possession by domestic-violence misdemeanants, against a Second Amendment challenge); *United States v. Chovan*, 735 F.3d 1127, 1141-42 (9th Cir. 2013) (same). In unpublished cases, the Court has repeatedly reaffirmed those published decisions.[1]

---

[1] *See United States v. Torress*, 789 F. App'x 655, 657 (9th Cir. 2020) (unpublished) ("this court is bound under [prior precedent] to assume the propriety of felon firearm bans"); *Michaels v. Sessions*, 700 F. App'x 757, 758 (9th Cir. 2017) (unpublished) ("prior precedent forecloses Michaels's as-applied challenge to § 922(g)(1)"); *United States v. Mendez*, 584 F. App'x 679, 679 (9th Cir. 2014) (unpublished) ("The district court properly rejected Fidel Mendez's Second Amendment challenge [to § 922(g)(1)]."); *United States v. Kyle*, 565 F. App'x 672, 673 (9th Cir. 2013) (unpublished) ("§ 922(g)(1) does not violate Kyle's Second Amendment right to bear arms"); *United States v. Schrag*, 542 F. App'x 583, 585 (9th Cir. 2013) (unpublished) (prior precedent "rebuts Schrag's contention that his Second Amendment rights may not be limited just because he is a felon"); *United*

Defendant claims *Bruen* upended that precedent. Not so. Binding precedent may be deemed overruled only "where the reasoning or theory of" the earlier "authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller*, 335 F.3d at 893. That "is a high standard." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (citation omitted). "[T]ension" between cases is not enough. *Id.* (citation omitted). Thus, "[s]o long as [a] court can apply . . . prior precedent without running afoul of the intervening authority it must do so." *Id.* (citation omitted). *Bruen* does not come close to meeting that high standard. It did away with the "means-end scrutiny" "second step" that courts had applied in some Second Amendment cases. *Bruen*, 142 S. Ct. at 2125-27. Yet, while Ninth Circuit cases upholding other types of laws have relied on the means-end scrutiny analysis, *see, e.g.*, *Chovan*, 735 F.3d at 1141-42, the cases upholding § 922(g)(1) did not. Instead, they relied, among other things, on interpretations of *Heller* that, as discussed above, were never called into question by *Bruen*.

Defendant disagrees. He says *Vongxay* "relied on a line of cases that had upheld felon-in-possession laws under the means-end scrutiny of the second step." Dkt. 29 at 9. That reading is wrong. *Vonxgay* did observe that one court had upheld the felon-in-possession law under means-end scrutiny. 594 F.3d at 1117 (citing *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). But it cited many others that upheld the law without ever mentioning means-end scrutiny. *See id.* (citing *Smith*, 329 F. App'x at 111; *Gilbert*, 286 F. App'x at 386; *United States v. Baron*, Nos. 6CR2095-FVS, 8CR3048-

States v. Small, 494 F. App'x 789, 791 (9th Cir. 2012) (unpublished) ("the district court properly determined that Mr. Small's prosecution [under § 922(g)(1)] did not infringe on his Second Amendment rights"); *United States v. Duckett*, 406 F. App'x 185, 186 (9th Cir. 2010) (unpublished) (argument that § 922(g)(1) violates the Second Amendment "is squarely foreclosed"); *United States v. Parker*, 371 F. App'x 749, 750 (9th Cir. 2010) (unpublished) (rejecting argument that "§ 922(g)(1) is unconstitutional because . . . it infringes the Second Amendment right to bear arms"); *United States v. Smith*, 329 F. App'x 109, 110 (9th Cir. 2009) (unpublished) ("Smith's argument that § 922(g)(1) is unconstitutional . . . is without merit."); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished) ("convicted felons . . . do not have the right to possess any firearms").

FVS, 2008 WL 5102307, at *2 (E.D. Wash. Nov. 25, 2008) (unpublished)). Most importantly, the Court never conducted a means-end scrutiny analysis or purported to rely on means-end scrutiny in upholding the law. In fact, it clarified that it was not doing so since, "whatever standard of review the Court implicitly applied to Heller's right to keep arms in his home" (none, as *Bruen* clarified) "is inapplicable to Vongxay, a felon who was explicitly excluded from *Heller*'s holding." *Id.* at 1118. Later published cases holding the same, many of which Defendant does not address, likewise never applied means-end scrutiny. And beyond all that, *Bruen*'s repeated focus on law-abiding citizens and the assurances that it was not calling into question other laws, as catalogued above, show that nothing in *Bruen* calls into question precedent addressing the felon-in-possession law.

The way the Ninth Circuit analyzed its own precedent in the wake of *Heller* reinforces the lack of clear irreconcilability here. Before *Heller*, the Court upheld § 922(g)(1) based on the conclusion "that the Second Amendment does not confer an individual right to possess arms." *Id.* at 1116 (quoting *Younger*, 398 F.3d at 1192). The Court later noted that "[t]he reasoning upon which *Younger* was based . . . was invalidated by *Heller*," but concluded that it was "still bound by *Younger*." *Id.* The Court then went on to consider *Heller*'s identification of felon-in-possession laws as presumptively valid, "cases from other circuits," and "historical gun restrictions" in support of maintaining *Younger*'s holding. *Id.*; *see also Phillips*, 827 F.3d at 1174 n.1. Here, since *Bruen* did not undercut *Vonxgay* and its progeny's central rationale, including its reliance on *Heller*'s discussion of felon-in-possession laws, but instead bolstered that rationale, the question of whether to apply precedent is far easier. This Court should do so and deny Defendant's motion to dismiss.

### 3. *Every other circuit agrees that the law is constitutional.*

The Ninth Circuit is not alone. Every other circuit has faced Second Amendment challenges of one type or another to § 922(g)(1), and every other circuit has rejected those

challenges.[2] The only case deeming § 922(g)(1) unconstitutional of which the government is aware held only that the law was unconstitutional as applied to state-law misdemeanors resulting in no jail time. *See Binderup*, 836 F.3d at 352 n.6. The cases thus speak with one voice in rejecting arguments like the one Defendant advances here.

Defendant presumably thinks *Bruen* did away with those cases too. But for the same reasons he is wrong about Ninth Circuit precedent, he is wrong about other circuits' precedent. First, aside from the Seventh Circuit's *Hatfield* decision, which appears to have upheld the law under intermediate scrutiny, the courts in the above-cited cases did not reach the means-end-scrutiny analysis that *Bruen* rejected. Second, as discussed, *Bruen* is fully consistent with prior conclusions about felon-in-possession laws. Thus, persuasive authority, like binding authority, supports rejecting Defendant's Second Amendment challenge.

---

[2] *See United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (rejecting claim that § 922(g)(1) was unconstitutional as applied to defendant with "drug dealing" conviction); *United States v. Bogle*, 717 F.3d 281-82 (2d Cir. 2013) ("We . . . join every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons."); *Folajtar v. Att'y Gen.*, 980 F.3d 897, 911 (3d Cir. 2020) ("*Heller* recognizes that the Second Amendment permits a broad bar for felons, and our historical analysis confirms that generally conclusive ban."); *Hamilton v. Pallozzi*, 848 F.3d 614, 628 (4th Cir. 2017) ("a state law felon" cannot state "an as-applied Second Amendment" claim); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (affirming "the constitutionality of § 922(g)[(1)]"), *abrogated on other grounds by Borden v. United States*, 141 S. Ct. 1817 (2021); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) ("Congress's prohibition on felon possession of firearms is constitutional"); *Hatfield v. Barr*, 925 F.3d 950, 952 (7th Cir. 2019) ("[A prior Seventh Circuit case] collects decisions from many circuits holds that § 922(g)(1) is valid and properly applied to a variety of crimes and offenders. We now hold that § 922(g)(1) may be applied to a felon convicted of fraud."); *United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022) (rejecting argument that "the location of [Williams's] firearm in the home . . . makes § 922(g)(1) unconstitutional as applied to him"); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (rejecting argument that "§ 922(g)[(1)] violates the Second Amendment"); *Rozier*, 598 F.3d at 771 ("statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people"); *Medina v. Whitaker*, 913 F.3d 152, 154 (D.C. Cir. 2019) ("we conclude that felons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment").

### 4.     *Historical evidence supports the felon-in-possession law.*

Given the precedent just discussed, the Court need not address Defendant's historical arguments about felon-in-possession laws. Yet even if the Court were to accept Defendant's invitation to toss out the dozens of cases rejecting his claim and instead evaluate it on a clean slate, there is historical precedent for the felon-in-possession law. To be sure, Defendant's motion cites various concurrences and dissents in which judges have argued that the evidence does not support barring *all* felons from possessing guns. That is unsurprising. After all, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)); *see also id.* at 2134 ("applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins" (quoting *Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting)). So it is understandable that not *everyone* would agree. Still, to date, majority opinions and "most scholars" agree that the history, as outlined below, supports the constitutionality of the felon-in-possession law. *Medina*, 913 F.3d at 159 (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010)). The Court should follow that prevailing view.

### a. Consequences of Felonies.

Under the common law "at the time of the Founding," felonies, which included both violent and nonviolent offenses, "occasion[ed] a total forfeiture of either lands, or goods, or both" and "were so connected with capital punishment that it was 'hard to separate them.'" *Medina*, 913 F.3d at 158 (quoting 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769)). "American colonists imported the English concept of felonies and their consequences into their legal systems." *Folajtar*, 980 F.3d at 904. Capital punishment was thus "ubiquitous in the Founding Era, . . . even to punish non-violent felonies" like forgery, dealing in forged securities, and counterfeiting. *Id.* (citing John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012)). For example, in Georgia, "at the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital

13

offenses." *Medina*, 913 F.3d at 158 (citing Stuart Banner, *The Death Penalty: An American History* 18 (2002)). Thus, "it is difficult to conclude that the public, in 1791, would have understood that someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158). Instead, given "these historically grounded and sensible explanations," legislatures may "impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction." *Id.* (quoting *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (Sutton, J., concurring)).

Defendant argues that "the English never tried to disarm all felons." Dkt. 29 at 13. Instead, they targeted the "violent and rebellious" and used "different enforcement mechanism[s]," like "sureties" and more limited disarmament. *Id*. True. But just as Congress today may choose to legislate "well above th[e] floor" set by the Second Amendment, the English could choose to legislate above the floor set by the common-law right to keep and bear arms. *Mai v. United States*, 952 F.3d 1106, 1120 n.9 (9th Cir. 2020). Here, the evidence suggests that the English did just that in the laws Defendant cites. That is, since the English believed it proper to strip felons of life, estate, and property, they would have understood that felons could also be stripped of gun rights. They simply chose not to fully exercise that power in all cases. And while felon-in-possession laws may not be a "historical *twin*" or "a dead ringer for historical" felony penalties, the Court should conclude that they are "analogous enough to pass constitutional muster" given that those historical penalties were often far more serious than gun bans.  *Bruen*, 142 S. Ct. at 2134.

Defendant also argues that England executed "only" 15.5 percent or so of its felons, that execution was "even less common in the United States," and that the United States "also took pride in its comparatively infrequent use of forfeiture." Dkt. 29 at 17. First, regarding England, it is hard to see how Defendant's point helps him. He cites an article estimating that, from 1718 to 1769, a criminal court with jurisdiction over London and Middlesex sentenced between 15.5 to 18 percent of felons to death. *See* Javier Bleichmar, *Deportation As Punishment: A Historical Analysis of the British Practice of Banishment*

14

*and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 & n.74 (1999). Assuming the estimate is accurate, it is still a substantial number that underscores the grave and common consequences of felony convictions. And as the same article notes, "almost seventy percent of felons" not sentenced to death were "banished" from England. *Id.* at 126. That too is an extreme consequence. So even setting aside the death penalty, "it is difficult to conclude that the public . . . would have understood someone facing [banishment] and estate forfeiture to be within the scope of those entitled to possess arms." *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158).

As for his argument about American practice, Defendant cites a single statement indicating that America had fewer capital crimes than England around the time of the founding. But even if that is true, one thing is clear: the death penalty was "ubiquit[ous] . . . in the founding era" and "was 'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (quoting Banner, *supra*, at 23). As noted above, those crimes included things like horse theft, forgery, dealing in forged securities, and counterfeiting. *See Folajtar*, 980 F.3d at 904-05. True, during the 1800s, penalties for many felonies began to decrease and forfeiture of estates fell into disuse. *See id.* at 905; *Medina*, 913 F.3d at 158. But suffice it to say, after "American colonists imported the English concept of felonies and their consequence into their legal systems," they didn't stray too far from the English tradition before ratifying the Constitution. *Folajtar*, 980 F.3d at 904. So given the public understanding and implementation of felony penalties in America at the time of the founding, it is reasonable to conclude that felons would not have been understood as falling within the scope of those who possessed the right to keep and bear arms. *See id.* at 905; *Medina*, 913 F.3d at 158.

### b. Early Laws and Practice.

"Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Skoien*, 614 F.3d at 640. Nor did they extend the right to certain other classes of people. For example, Connecticut,

Pennsylvania, and Massachusetts barred guns for those "[r]efusing to swear an oath, defaming acts of Congress, or failing to defend the colonies." *Folajtar*, 980 F.3d at 908 & n.11; *see also Medina*, 913 F.3d at 159 ("Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"). That evidence suggests that "the public in the founding era understood that the right to bear arms could exclude" "dangerous persons" and "at least some nonviolent persons." *Medina*, 913 F.3d at 159.

Defendant cites some of those laws and a few others. He argues that the laws show only that a state allowed gun bans for those who "posed a risk of violence to the state." *Id.* at 17. Not so. "Refusing to swear an oath, defaming acts of Congress, or failing to defend the colonies do not of themselves qualify as dangerous. The same is true of the examples cited by [Garcia] of refusing to swear allegiance or loyalty to the sovereign." *Folajtar*, 980 F.3d at 908 n.11. So contrary to Defendant's contentions, those laws support the conclusion that "the Second Amendment was understood to exclude more than just individually identifiable dangerous individuals." *Medina*, 913 F.3d at 159.

### c.   *Ratification-Convention Proposals.*

At their ratification conventions, several states proposed amendments clarifying that the right to bear arms applied to law-abiding citizens. For example, in 1787, the Pennsylvania Antifederalists issued The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, which proposed an amendment stating that "no law shall be passed for disarming the people . . . unless *for crimes committed*, or real danger of public injury from individuals." *Folajtar*, 980 F.3d at 908 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). As the text indicates, under that amendment, "criminals or other dangerous persons could be disarmed." Stephen P. Halbrook, *The Founders' Second Amendment* 196 (2008). "Other states proposed similar amendments." *Folajtar*, 980 F.3d at 908. New Hampshire proposed an amendment stating that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* (citation omitted). And Samuel

Adams of Massachusetts proposed an amendment requiring that "the said Constitution be never construed . . . to prevent the people of the United States[] who are peaceable citizens . . . from keeping their own arms." *Id.* (citation omitted). That amendment, in other words, clarified that "the right to keep arms extended only to 'peaceable citizens,' not to criminals." Halbrook, *supra*, at 206. Taken together, those proposals support the conclusion that the founding-era Americans did not understand the right to keep and bear arms to extend to felons. *See Folajtar*, 980 F.3d at 908; *Medina*, 913 F.3d at 158-59.

Defendant notes that those proposals never "made it into the final text," that *Heller* cautioned against relying on state-convention proposals, and that state-convention proposals differed. Dkt. 29 at 18. Fair enough. But those proposals still support the constitutionality of § 922(g)(1). First, while the Second Amendment did not contain explicit qualifications like those in the cited proposals, that is not because it was understood to exclude those qualifications. Instead, "Samuel Adams and the drafters of the New Hampshire proposal did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms, because this . . . was understood." Halbrook, *supra*, at 273; *see also Skoien*, 614 F.3d at 640 (similar). As an article printed in Boston and Philadelphia noted, the Second Amendment was deemed to contain "[e]very one of" the amendments "introduced to the convention of this commonwealth by . . . Samuel Adams" (except the restriction against a standing army). Bos. Indep. Chronicle, Phila. Indep. Gazetteer 2 (Aug. 20, 1789). Similarly, the Speaker of the House from Pennsylvania wrote in a letter that the Second Amendment "t[ook] in the principal Amendments which our Minority had so much at heart." Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789); *see also Whether the Second Amendment Secures an Individual Right*, Op. Off. Legal Counsel, pt. III.C.2, at 198-99 & nn.297-98 (2004), *available at* http://www.usdoj.gov/olc/opinions.htm (discussing article from Boston and Philadelphia and letter from Speaker of the House).

Second, *Heller* deemed "New Hampshire's proposal, the Pennsylvania minority's proposal, and Samuel Adams' proposal in Massachusetts"—the same proposals cited

1   here—accurate reflections of the right to keep and bear arms, at least regarding its
2   individual nature. 554 U.S. at 604. It also deemed the Pennsylvania proposal "highly
3   influential." *Id.*; *see also United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D.W. Va.
4   2010) (deeming the proposal notable because it showed that "[e]ven these advocates of
5   broad individual and state rights viewed the right to possess and carry arms as limited—
6   particularly from those who had committed crimes or were a danger to the
7   public"), *aff'd*, 468 F. App'x 357 (4th Cir. 2012) (unpublished). Even an opinion
8   Defendant cites, while interpreting the proposals differently, dubs them "[t]he most
9   germane evidence available" and "the best evidence we have." *Binderup*, 836 F.3d at 368
10  (Hardiman, J., concurring in part and concurring in the judgment). And no court has
11  "unearthed any evidence that the . . . proposed amendments were then thought to be
12  unconstitutional." *Folajtar*, 980 F.3d at 909. Thus, while Defendant is right that the Court
13  should not over-weight the proposals, they nevertheless support the conclusion that felon-
14  in-possession laws are constitutional.

15              ### d.  The "Virtuous Citizen" Theory.

16          "[M]ost scholars of the Second Amendment agree that the right to bear arms" was
17  tied to "virtuous citizen[ry]" and "does not preclude laws disarming the unvirtuous
18  citizens (i.e, criminals)." *Vongxay*, 594 F.3d at 1118 (quoting Don B. Kates, Jr., *The
19  Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)). Nor did it
20  preclude disarming "those who, like children or the mentally imbalanced, are deemed
21  incapable of virtue." *Medina*, 913 F.3d at 159 (quoting *United States v. Rene E.*, 583 F.3d
22  8, 15 (1st Cir. 2009)). "Americans in the Founding Era . . . believed '[i]t is because the
23  people are civilized, that they are with safety armed.'" *Folajtar*, 980 F.3d at 905 (quoting
24  David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens
25  Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 794
26  (2014)). That is, "the eighteenth-century American's right to bear arms was intimately tied
27  to long-standing practices that explicitly separated the class of armed law-abiding citizens
28

from felons." *Id.* "Several circuits have relied on this theory" to uphold laws barring non-violent persons from owning guns. *Medina*, 913 F.3d at 159.

Defendant argues that the "virtuous citizen" theory at most supported stripping the unvirtuous of "civic rights (such as jury service or voting), not individual rights (such as the freedom of speech)." Dkt. 29 at 17. And since *Heller* held that the right to keep and bear arms is an individual right, he reasons, "conditioning the Second Amendment's protections on virtuousness is inconsistent with *Heller*." *Id.* But that dichotomy and conclusion are false. Civic rights *are* "individual rights." *Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111. And while those rights serve a "distinctly public purpose," *id.* (citation omitted), they need not *exclusively* serve that purpose. For example, while the right to participate in government serves broader governance purposes, *see id.*, it also protects "the sacred and inviolable rights of private property" by ensuring that an individual is not subject to "aids or taxes" except "by his own consent, or that of his representatives," 1 William Blackstone, *Commentaries on the Laws of England* 135 (1765). The same is true of the Second Amendment.

While the Second Amendment protects the "core lawful purpose of self-defense," it also "prevent[s] elimination of the militia" and arguably promotes "public[ ]safety." *Heller*, 554 U.S. at 599, 601, 630. In other words, "the Founders had a predilection for both a well-regulated militia and an individual right to have arms, and . . . they envisioned that the two clauses of the Amendment would complement rather than be in tension with each other." Halbrook, *supra*, at 5; *see also* Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 Yale L.J. 1193, 1262 (1992) ("the Second Amendment fused together arms-bearing, militia service, and (implicitly) political participation"), *id.* at 1265 (the Second Amendment "marbled together" "individual rights" and "'public' rights"); *cf.* Halbrook, *supra*, at 158 (right to bear arms was "a right of the people" but also served as "defense against foreign invasion" and upheld "institutions such as the hue and cry in which citizens defended themselves from and pursued felons"); *id.* at 160 (citing

19

1   Massachusetts law passed after Shay's Rebellion in 1786 stating that "the people have a
2   right to bear arms" and calling on "the virtuous citizens" to be ready to oppose those
3   wishing to "subvert the laws and Constitution of Their country" (citation omitted)). Thus,
4   while *Heller* confirmed that the Second Amendment confers an individual right based on
5   self-defense, it did not foreclose barring the right for the unvirtuous. *See United States v.*
6   *Emerson*, 270 F.3d 203, 227 n.21 (5th Cir. 2001) (felon-in-possession law "is in no way
7   inconsistent with an individual rights model"). *Heller*'s focus on "law-abiding citizens"
8   and confirmation that it was not calling into question felon-in-possession laws confirms
9   as much. 554 U.S. at 625-626 & n.26, 635.

10                      *e. Later History.*

11       Late 19th-century and 20th-century historical evidence is not especially relevant
12   here. As the Supreme Court has noted, it is an open question whether courts should look
13   to the public meaning of the right to bear arms in 1791, when the Second Amendment was
14   ratified, or 1868, when the Fourteenth Amendment was ratified, when deciding if a state
15   law violates the Second Amendment as applied to the states through the Fourteenth
16   Amendment. *See Bruen*, 142 S. Ct. at 2138; *see also id.* at 2163 (Barrett, J., concurring).
17   But whatever the answer, "late-19th-century evidence cannot provide much
18   insight . . . when it contradicts earlier evidence." *Id.* at 2154. Here, that conclusion is even
19   stronger since Defendant is attacking a federal law and the inquiry plainly centers on the
20   public meaning of the right to keep and bear arms as of 1791.

21       Defendant argues that 19th- and 20th-century historical evidence supports his
22   argument. Dkt. 29 at 18-20 Yet he agrees that the 20th-century history is irrelevant and
23   offers no reason to consider the late 19th-century evidence. Regardless, that evidence does
24   not help him. He relies mainly on a Texas case. But it addressed neither the federal
25   constitution nor a law analogous to the one here. *See Jennings v. State*, 5 Tex. Ct. App.
26   298, 298 (1878). And Garcia's reliance on that case is especially odd since the Supreme
27   Court has deemed 1870s Texas courts poor expositors of the Second Amendment. *See*
28   *Bruen*, 142 S. Ct. at 2153 (rejecting the views of three 1870s Texas opinions). So in short,

the Court should place little weight on the evidence Defendant cites, which is far removed from and sheds little light on the public meaning of the Second Amendment.

\* \* \*

Perhaps someday Defendant's historical analysis will prevail. But for now, that analysis is not the prevailing view, and the Court should decline to follow it. Indeed, it should decline to wade into the historical analysis at all, as Supreme Court precedent, Ninth Circuit precedent, and persuasive authority from every other circuit are more than enough to decide this case. *Bruen* does not call any of that precedent into question, but instead reinforces it by, among other things, continually focusing on the gun rights of "law-abiding citizens." This Court should thus apply that precedent and deny Defendant's motion to dismiss.

### 5.   Even if some version of Defendant's historical analysis were right, the felon-in-possession law would still be constitutional as applied to him.

Defendant never says exactly what laws the historical evidence supports but suggests that even those who are "violent" or are "convicted of serious crimes" cannot be barred from possessing guns indefinitely. Dkt. 29 at 11. But not even the authorities he cites who question whether felon-in-possession laws are constitutional in all their applications hold that view. Some judges believe history supports disarming those who commit "serious crimes," which may include both violent and non-violent crimes, indefinitely. *See Binderup*, 836 F.3d at 349-50 (plurality opinion). Under that view, "the legislature's decision to label an offense a felony is generally conclusive in [the] analysis of seriousness." *Folajtar*, 980 F.3d at 903. Other judges think "the state can take right to bear arms away from a category of people that it deems dangerous" but cannot take that right away from non-violent felons unless their "history or characteristics make [them] likely to misuse firearms." *Kanter*, 919 F.3d at 464, 468 (Barrett, J., dissenting).

Under the first view, Defendant cannot prevail. He has three felony convictions, two of which are drug trafficking/manufacturing that resulted in sentences of at least 7 years in both instances. California deemed these crimes significant enough to categorize them as felonies, which is all but enough to end the inquiry here. *See id.* And looking to

his history and characteristics, his rape of his 14-year-old step daughter (for which he has pled guilty) in the very bedroom in which he kept multiple firearms with which he is now being charged certainly places him in the highest category of dangerous persons and category of people that are likely to misuse firearms.

Even under the most expansive view, which ties disarmament to violence, it is questionable whether the law is unconstitutional as applied to Defendant. Admittedly, the inquiry may not be easy, which is why several courts have identified practical problems with the approach. *See id.* at 906-07; *Hatfield*, 925 F.3d at 952-53; *see also Folajtar*, 980 F.3d at 909 (noting that "nonviolent offenders are at a higher propensity for committing violent crimes"). Regardless, Defendant has multiple drug felonies, one for manufacturing and one for distribution. *See id.* at 4; *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting) (approving of prior precedent upholding law banning guns for those who abuse drugs given connection between drug abuse and violence); *Binderup*, 836 F.3d at 362 (Hardiman, J., concurring in part and concurring in the judgment) (similar). So Defendant's history and characteristics all indicate that he has and will likely continue to misuse firearms; thus § 922(g)(1) can be applied to him.

## IV.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant's motion be denied.

Dated:          October 25, 2022          RANDY S. GROSSMAN

United States Attorney

s/ Connie V. Wu
CONNIE V. WU
Assistant United States Attorney