RANDY S. GROSSMAN
United States Attorney
CONNIE V. WU (#297177)
Assistant United States Attorney
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8592
Connie.Wu@usdoj.gov

Attorneys for the United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE ANGEL SERRANO,
a.k.a. "El Joey,"

Defendant.

Case No.: 21-cr-1590-JLS

**UNITED STATES' SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

Date: November 28, 2022
Time: 9:00 a.m.
The Hon. Janis L. Sammartino

The United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Connie V. Wu, Assistant United States Attorney, hereby files its post-hearing supplemental response in opposition to the above-captioned motion. This response in opposition is based upon the files and records of the case, including the November 1, 2022 evidentiary hearing, together with the attached statement of facts and memorandum of points and authorities.

//

//

//

//

//

//

**I.**

**STATEMENT OF FACTS RELEVANT TO THE SUPPRESSION HEARING**[1]

On Monday, March 15, 2021, the Chula Vista Police Department responded to a call on Fernwood Road in Chula Vista that the Defendant, Jose Angel Serrano, drugged and forcibly raped and sodomized his 14-year-old stepdaughter, MV1. Defendant lived at the Fernwood residence with his wife ("Defendant's wife"), her daughters (including MV1), and a renter, Ms. Beltran. Defendant was not present when police initially responded to the call, and the police were invited into the residence by Defendant's wife and Ms. Beltran. The police arrived at the residence at 1:00 pm, where they were met by Defendant's wife, two of her daughters, and Ms. Beltran. The police did not have a warrant at the time, but Defendant's wife asked them to come inside and investigate their allegation that Defendant had raped her daughter, MV1. This allegation was proven by a rape kit using DNA Defendant voluntarily provided, the results of which were provided in discovery. Furthermore, Defendant left a hickey on her neck, which was also documented in discovery.

MV1 told the police that on the night of the rape, Defendant had given her alcohol and made her do drugs. **D2 R2 at 0:26-40.** He introduced her to cocaine for the first time by putting it up her nose, having her sniff it, and then having her snort another three lines of cocaine from a rolled up piece of paper off a mirror in the master bathroom. ***Id*. at 01:17-01:37.**

While inside, the police interviewed the visibly anguished family and MV1, who demonstrated obvious signs of physical injury resulting from the forcible rape that had occurred the night prior. Family members led police officers throughout the house to show them the areas of the house in which the assault had occurred. *See* D1 R3. While in the

---

[1] On November 1, 2022, the United States played and admitted in evidence the **bolded** body-worn camera (BWC) footage during the evidentiary hearing. These videos were lodged with the Court on November 15, 2022, and a copy was produced to the defense on November 9, 2022 for inspection. The United States reached out to the Court to note that the Exhibit List, ECF 54, was incomplete with respect to Government's admitted exhibits.

master bedroom, Defendant's wife pulled out multiple firearms Defendant maintained in the bedroom dress and placed them on the bed for the officers to see. With assistance from the family pulling out several of the items, police found a ghost gun, ammunition, armor piercing ammunition, air rifles, firearm parts, and body armor. *See* D1 R3 09:15-24:30; *see also* D3 R12. While some officers were searching the upstairs master bedroom, others were also interviewing MV1, Defendant's wife, Defendant's wife's other daughter, and Ms. Beltran.

After interviewing Defendant's wife, her other daughter and Defendant's wife unlocked the door to the garage and showed police a locked tool drawer. ***See* D3 R4.** The police found what appeared to be a "pay-owe" list, and Defendant's wife's daughter informed the police that there were drugs inside of the locked tool cabinet, including cocaine and a "bag of pills" that she gestured with her hands to be a medium-sized bag about a foot long and a foot wide. ***See* D3 R15 at 0:30-2:00**. Before she was able to locate the keys to the drawer, Defendant's stepdaughter asked the officer if he could break open the locked container. An officer informed them, "Unfortunately, I can't break it." **D3 R4 at 1:09**. Defendant's stepdaughter asked, "What if I break it?" ***Id.* at 1:11**. The officer replied, "That's your decision. It's your home…If you guys want to break it, I can't tell you *not* to; I can't tell you to…it's up to you…I can't physically do anything about it." ***Id.* at 1:11-1:34.**

In response to Defendant's wife and her daughter's claim that the locked tool cabinet contained cocaine (which is the drug MV1 stated Defendant forced her to use), an officer peered into the cracks of the tool cabinet with a flashlight, but without manipulating, pulling, or prying the container open. **D3 R15 at 0:25-1:21**. As Detective Shaun Myer described during the November 1, 2022 evidentiary hearing, all he did at this time was illuminate the area with his flashlight and analogized his actions to shining a flashlight into a car window during a vehicle stop. He testified that he could see through the 1.5-inch gap at least two drug scales and some residue on the scales; however, he could not tell if it was cocaine or fentanyl residue from that vantage point.

Upon learning that Defendant would not be arrested for rape at that time pending the results of the rape kit, the family became angry and distraught, and Defendant's wife stated that she was not only accusing him of being a rapist but she was also accusing him of being a drug trafficker. She asked the officer, "Can you at least see what is in the garage?" **D2 R25 at 6:09.** The police responded, "Sure, do you want to show me?" ***Id*. at 06:12.** Defendant's wife led officers back into the garage and opened the locked tool cabinet with the key she had since located. ***Id.* at 06:39-09:15.** She proceeded to show officers the contents of the locked tool cabinet drawer by pulling the drawer all the way open and pulling items out of the drawer without the officers ever uttering a word of instruction or hint at what they wanted her to manipulate in the tool cabinet. ***Id.*** During this entire cited video segment, the officer standing next to her maintained one hand on his flashlight to illuminate the items Defendant's wife placed in his plain view and his other hand in his back pocket.

At the evidentiary hearing on November 1, 2022, Detective Myer confirmed that he did not provide any instructions or requests to Defendant's wife regarding what he wanted to see or pull out of the drawer. At one point, he testified he did caution her that she was holding a rock of methamphetamine in her hand, which was ungloved.

The search of the tool cabinet work bench initiated and performed by Defendant's wife confirmed her and and her daughter's allegation that it contained illegal drugs, including the cocaine and M-30 pills that they stated would be there in addition to other evidence and contraband. Likewise, there was a small black bag that Defendant's wife had pulled out for officers to look at that also contained methamphetamine. After discovering the assortment of drugs, police arrested Defendant for possession of controlled substances for sale, in violation of California Health and Safety Code § 11378(f).

//

//

//

//

## II.

## ARGUMENT

### A. Defendant's wife and stepdaughter possessed common authority over the garage and lawfully consented to its search.

The Supreme Court in *Illinois v. Rodriguez,* stated "a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of 'unreasonable searches and seizures' if the officers have obtained the consent of a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). In determining when a third-party has common authority, the Supreme Court in *United States v. Matlock*, stated that a third-party has common authority over an area when they "ha[ve] joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Furthermore, the Court reasoned that "common authority" may serve as the basis for a valid third-party consent because such authority makes it "reasonable to recognize that . . . [the other occupants] have assumed the risk that one of their number might permit the common area to be searched. *Id*.

The government's exhibits of BWC footage from the search of the garage played in court on November 1, 2022 prove conclusively that Defendant's wife and stepdaughter possessed common access and control over the garage. First, the BWC video showed that all family members have frequent access to the garage because the family dogs' crates are located there. During the hearing, the government played a clip of family members directing at least one dog into the crate located inside the garage. ***See* D3 R15 at 4:04.** Second, the videos also proved that Defendant's wife also accesses the garage if she's "working on something for the house or the motorcycles." **D3 R15 at 05:24-05:35.** Third, the government's hearing exhibits also depicted Defendant's stepdaughter casually and repeatedly rummaging through a communal refrigerator in the garage, which further proves the garage is a common area even if most of the items inside it belong to Defendant. ***See, e.g.,* D3 R15 at 0:44.** Lastly, multiple conversations Defendant's wife and stepdaughter had with Detective Myers in the government's video clips demonstrated their

familiarity with what items Defendant kept in his work bench and how long certain items had been there, further establishing their common authority over the garage. For instance, Defendant's stepdaughter described to officers that she had seen cocaine and pills of different colors in his tool cabinet, including a medium sized bag full of of them, which she gestured to officers to be about a foot long and a foot wide. **D3 R15 at 1:37-1:40.** Also, when officers noticed the cash counting machine in the garage, they asked Defendant's wife if it had always been there, and she responded Defendant had just brought it "like two…three weeks ago." **D3 R15 at 05:05-5:13.** Their knowledge of these facts with such specificity prove that they had common authority and regular access to the garage. These facts also demonstrate officers had every reason to believe that they had authority to consent to any search of the garage.

**B. The Fourth Amendment does not protect Defendant against a private search conducted by his wife.**

"The Supreme Court has long held that it does not violate the Fourth Amendment for a law enforcement officer to accept and use evidence that a private party discovers pursuant to its own private search, even if that private search was unlawful." *United States v. Phillips*, 32 F.4th 865, 867 (9th Cir. 2022). That is because the Fourth Amendment is only designed to protect against unlawful searches and seizures perpetrated by "governmental agencies" or "governmental action." *Id.* It is also well-settled by the Supreme Court that if a private party reveals that information to the authorities, "the Fourth Amendment does not prohibit governmental use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984).

In *Jacobsen*, employees of a private freight carrier ('FedEx") noticed a "white powdery substance" that was "originally concealed within eight layers of wrappings." *Id.* at 111. Upon finding the substance, the private FedEx employees pursuant to company policy cut open the packaging exposing four zip-lock plastic bags, at which point the employees called the Drug Enforcement Administration. *Id.* When the first DEA agent arrived, he saw that one tube had been slit open, and the agent removed four other plastic

bags from inside the packing and saw the white powder. *Id.* The agent then performed a field test identifying the substance as cocaine. *Id.* at 112.

In upholding the search, the Supreme Court made clear that whether the invasions by the private agents were "accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character." *Id.* at 115. The Court reasoned that after the frustration of original privacy occurs, "the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Id.* at 117. Lastly, even if the white powder was not in "plain view," there was virtual certainty that nothing else was in the package and its content would not tell agents more than they already knew from what "the private party had made freely available." *Id.* at 119-20. Since it was apparent it contained contraband and little else, and the private employees on their own accord, invited agents to examine the contents, the Fourth Amendment did not apply to the search and subsequent seizure. *Id.*

Here, since Defendant's wife beseeched the Chula Vista Police Officers to come into their home to find evidence that Defendant given MV1 cocaine and raped her, told officers about the cocaine and pills locked in the tool cabinet, and then took her own initiative to unlock the work bench and display its contents for the express purpose of revealing the contraband contained within to law enforcement, the Fourth Amendment does not afford Defendant any protection from the search initiated and conducted by Defendant's wife.

The government's exhibits from the evidentiary hearing also prove that the Defendant's wife was not acting as a governmental agent when she showed officers the contraband contained within the locked tool cabinet. In fact, when Defendant's wife first led officers into the garage, she noted the keys were gone and the tool cabinet drawer was locked as she pulled on it. ***See* D3 R15 at 00:30-1:08.** The family asked officers if they could break into it. An officer informed the Defendant's wife, "Unfortunately, I can't break it." ***Id.* at 1:09.** Defendant's stepdaughter asked, "What if I break it?" ***Id.* at 1:11.** The officer replied, "That's your decision. It's your home…If you guys want to break it,

I can't tell you not to; I can't tell you to…it's up to you…I can't physically do anything about it. ***Id*. at 1:11-1:34.**

Understanding that law enforcement would not be a party to breaking into the Defendant's work bench, Defendant's wife later asked to show the officers what was in the garage, opened the locked tool cabinet with a key she had located, and proceeded to pull out much of its contents to display the controlled substances and contraband to officers. With one hand on his flashlight and the other in his pocket behind his back, the officer was merely a bystander to the wife's invasion of her husband's privacy. At the evidentiary hearing on November 1, 2022, Detective Myer testified that he observed Defendant's wife unlock and proceed to search the tool cabinet in his presence. The video, *id.*, and testimony confirmed that she pulled items out of the drawer to place them in his plain view; however, he did not provide any instructions or requests regarding what he wanted to see. At one point, he did warn her that she was holding a rock of methamphetamine in her hand. Detective Myer testified that he did not otherwise direct her to search the tool cabinet or her manner of searching it. As Detective Myer testified, his observation of her search did reveal sufficient contraband to establish probable cause for further searches later conducted by law enforcement.

Indeed, the Supreme Court clearly held that the Fourth Amendment does not protect circumstances where a private party exposes another's private information, irrespective of the deliberateness of the action. *Jacobsen*, 466 U.S. at 117. Thus, Defendant's wife's motive for opening the locked drawer and exposing the drugs – even if it was to facilitate Defendant's arrest – is of no legal consequence because the Fourth Amendment is intended to protect citizens against government intrusions, not private ones.

## III.
## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant's motion to suppress be denied on all grounds.

Dated: November 15, 2022

RANDY S. GROSSMAN
United States Attorney

s/ Connie V. Wu
CONNIE V. WU
Assistant United States Attorney