UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE ANGEL SERRANO,<br><br>Defendant. | Case No.: 21-CR-1590 JLS<br><br>**ORDER (1) DENYING DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE AND (2) DENYING DEFENDANT'S MOTION TO DISMISS FIREARM CHARGES**<br><br>(ECF Nos. 40, 49) |

Presently before the Court is Defendant Jose Angel Serrano's ("Defendant" or "Serrano") Amended Motion to Suppress Evidence ("Evid. Mot.," ECF No. 40) and Motion to Dismiss Firearm Charges ("Firearm Mot.," ECF No. 49). The Government filed Responses to both of Defendant's Motions ("Evid. Opp'n," ECF No. 50; "Firearm Opp'n," ECF No. 51). After an evidentiary hearing, the Court requested supplemental briefing on Defendant's Motion to Suppress. The Government submitted a Supplemental Response thereto (ECF No. 57), and Defendant submitted a Supplemental Memorandum in Support of the Motion to Suppress (ECF No. 58). The Court also requested supplemental briefing on Defendant's Motion to Dismiss Firearm Charges. *See* ECF No. 59. The Government

provided a supplemental response (ECF No. 63) and Defendant filed a reply thereto (ECF No. 64). Having considered the Parties' arguments and the law, the Court **DENIES** Defendant's Amended Motion to Suppress Evidence and **DENIES** Defendant's Motion to Dismiss Firearm Charges.

## BACKGROUND

On March 15, 2021, the Chula Vista Police Department responded to Defendant's residence at 1760 Fernwood Drive in Chula Vista after receiving a report that Defendant had sexually assaulted his stepdaughter. *See* ECF No. 57 at 2; ECF No. 58 at 2.[1] Defendant was not home when the investigating police officers arrived. ECF No. 57 at 2; ECF No. 58 at 2. While the officers did not have a search warrant for the residence, Defendant's wife, Ms. Valenzuela, allowed the officers inside to conduct the investigation. ECF No. 57 at 2; ECF No. 58 at 2. The victim told police that Defendant had given her cocaine and sexually assaulted her the previous night. *See* ECF No. 35-3 at 6. Ms. Valenzuela and her other daughter (the victim's sibling) led the officers to the garage, where Defendant kept a locked workbench allegedly containing cocaine and other drugs. ECF No. 57 at 2–4; ECF No. 58 at 2–3. Before Ms. Valenzuela was able to locate the key for the workbench, Agent Shaun Myers, one of the investigating Chula Vista police officers, attempted to view what was inside by peering through a one-inch gap in the workbench with the aid of a flashlight. ECF No. 57 at 3; ECF No. 58 at 2. Myers testified that he could see what appeared to be weighing scales and a white residue that resembled either cocaine or fentanyl. ECF No. 57 at 3; ECF No. 58 at 2. Ms. Valenzuela's daughter asked police if they could break into the workbench, but Myers told her police could not do so without a search warrant. D3 R15 at 0:35–0:45.

Upon learning that police were unable to arrest Defendant in connection with the alleged sexual assault that evening, Ms. Valenzuela took police back into the garage, unlocked the workbench with a key she had since located, and opened the drawer so that

---

[1] Pin citations refer to the CM/ECF page numbers electronically stamped at the top of each page.

police could see inside.  ECF No. 57 at 4; ECF No. 58 at 2.  Ms. Valenzuela then rummaged through the toolbox, showing officers various illegal drugs, including cocaine and methamphetamine.  ECF No. 57 at 4; ECF No. 58 at 3; D2 R25 at 6:39–9:15.  Police subsequently arrested Defendant, who by that time had arrived home and was being questioned about the sexual assault allegations.  ECF No. 57 at 4; ECF No. 58 at 3.  While conducting a search of Defendant's person incident to the arrest, officers discovered an electronic key.  ECF No. 58 at 3.  The key opened a safe located in the bedroom of Claudia Beltran, a tenant living in Defendant's home.  *Id.*  The safe contained about 500 grams of cocaine, 100 grams of methamphetamine, $46,000 in cash, a handgun, and ammunition.  Statement of Facts and Memorandum of Points and Authorities in Support of Defendant's Amended Motion to Suppress Evidence ("Evid. Mem.," ECF No. 40-1) at 5.

Defendant was ultimately charged with being a felon in possession of a firearm (counts one through four); possession of methamphetamine with intent to distribute (count five); possession of cocaine with intent to distribute (count six); possession of a firearm in furtherance of drug trafficking (counts seven through ten); possession of a firearm with an obliterated serial number (count eleven); and possession of an unregistered firearm silencer (count twelve).  *See generally* ECF No. 17.

## MOTION TO SUPPRESS EVIDENCE

Defendant moves the Court to suppress all evidence found within the toolbox, as well as any resulting "fruit of the poisonous tree."  ECF No. 58 at 8.  The Court **DENIES** the Motion for the reasons that follow.

## I.   Discussion

### A.   *Common Authority Over Garage*

The Fourth Amendment prohibits unreasonable searches and seizures by the government.  U.S. CONST. Amend. IV.  "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."  *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  "It is well settled under the Fourth and

Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* Law enforcement officers may obtain consent to a search from a third party who possesses common authority over the premises. *United States v. Matlock*, 415 U.S. 164, 169–72 (1974). Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 172 n.7; *see also United States v. Kim*, 105 F.3d 1579, 1582 (1997) (finding that defendant assumed the risk that his associate would consent to search of storage locker by instructing the associate to lease the lockers, granting him access to the lockers, and allowing him to retain the keys).

Defendant maintains that the garage was his private "man cave," which was usually locked and limited to Defendant's use. ECF No. 58 at 2. Therefore, Defendant argues, Ms. Valenzuela "could not consent to [a] warrantless search of that space." Evid. Mem. at 9. According to the Government, on the other hand, police body-camera footage demonstrates that Ms. Valenzuela and her daughter possessed common authority over the garage and lawfully consented to the search. ECF No. 57 at 5–6.

Here, the Court finds that Ms. Valenzuela had common authority over the garage and therefore had the right to permit police officers to inspect the garage. Defendant himself concedes that the garage "was used to shelter family pets" and that there is a refrigerator in the garage that "was used and accessed by family members." ECF No. 58 at 2. The body-camera footage from the evening of the investigation shows Ms. Valenzuela ushering a dog into the crate and Ms. Valenzuela's daughter perusing the contents of the refrigerator as police investigated the locked workbench. D3 R15 at 0:44, 4:04. Such behavior is strong evidence that Ms. Valenzuela and other family members had open access

to the garage.  Moreover, Ms. Valenzuela told police officers that while everything in the garage belonged to Defendant and that she did not often enter the garage, she used the garage when working on house projects or the couple's motorcycles.  *Id.* at 5:24–5:35. Finally, while the garage was locked when police first arrived, Ms. Valenzuela had access to the key and unlocked it so that the officers could see the workbench.  ECF No. 57 at 3. Access to a key is consistent with common authority over the premises.  *See Kim*, 105 F.3d at 1582.

In sum, the body-camera footage and Defendant's own concessions are convincing evidence that Ms. Valenzuela had joint access to the garage for most purposes, and that Defendant assumed the risk that she might permit police to search the garage.  Accordingly, Ms. Valenzuela had actual authority to consent to the search of the garage.  *See United States v. Davis*, 332 F.3d 1163, 1168–69 (9th Cir. 2003) (recognizing that a third party has actual authority to consent to a search of someone else's property if the third party had mutual use of or joint access to the property).

### B.    Agent Myers's Peek Inside the Workbench

Next, Defendant contends that Agent Myers's "peek" inside the workbench exceeded the scope of the "plain view" exception to the Fourth Amendment's prohibition on unreasonable searches because he used a flashlight for aid.  ECF No. 58 at 5.  The Government did not explicitly address the "plain view" argument raised by Defendant.  It did note, however, that Agent Myers did not "manipulate[e], pull[], or pry[]" the workbench while peering inside it, implying that no unconstitutional seizure resulted from Agent Myers's conduct.  *Id.* at 3.

As stated above, a "search," for Fourth Amendment purposes, occurs when the government invades a "subjective expectation of privacy that society recognizes as reasonable."  *Kyllo*, 533 U.S. at 33.  If an object is already in plain view, however, its observation would not involve any invasion of privacy.  *Horton v. California*, 496 U.S. 128, 133 (1990).  Thus, the Supreme Court has held that "a truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is

not a 'search' for Fourth Amendment purposes." *Arizona v. Hicks*, 480 U.S. 321, 328 (1987); *see also Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost."). Moreover, "the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." *Texas v. Brown*, 460 U.S. 730, 740 (1983) (plurality) (citing *United States v. Lee*, 274 U.S. 559, 563 (1927)); *see also United States v. Dunn*, 480 U.S. 294, 305 (1987) ("[O]fficers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment."); *United States v. Hood*, 493 F.2d 677, 680 (9th Cir. 1974) (finding no search where "officer shined his flashlight in [a] car and saw vials of pills in plain view in [suspect's] open purse").

Here, the Court finds that Agent Myer's conduct in looking through gaps in the locked workbench with the aid of a flashlight did not constitute an unreasonable search or seizure. First, as discussed above, Agent Myers and the other Chula Vista police officers obtained consent from Ms. Valenzuela to enter the garage and therefore were lawfully in a position to observe the workbench and anything else exposed to plain view in the garage. *See United States v. Wheeler*, 641 F.2d 1321, 1324 (9th Cir. 1981) (concluding deputy's observations "were lawful because they were of objects in plain view from places where [deputy] had a right to be under the circumstances"). Second, Agent Myers's peek inside the workbench did not constitute a search for Fourth Amendment purposes. The scales and white residue inside the workbench were exposed to plain view through a gap in the workbench's drawer; therefore, observation of them did not invade Defendant's privacy. *See Hicks*, 480 U.S. at 328; *United States v. Buck*, No. 2:19-CR-00595-CAS-1, 2021 WL 1124290, at *2, *4–5 (C.D. Cal. Mar. 24, 2021) (finding no Fourth Amendment violation where deputy observed methamphetamine through roughly one-inch gaps in tool chest drawers). Agent Myers's use of a flashlight to illuminate such items does not change the outcome of the analysis. *See United States v. Wright*, 449 F.2d 1355, 1356–57, 1359 (D.C.

Cir. 1971) (finding no Fourth Amendment violation where police officer bent over and peered through eight-inch gap in garage door with aid of flashlight); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (finding no Fourth Amendment violation where police officers observed marijuana in partially open box with aid of flashlight). Finally, Agent Myers's actions did not constitute a seizure. The body-camera footage shows that Agent Myers did not manipulate the workbench in any manner. D3 R15 at 0:25–1:21, 2:35–3:05. Nor was any evidence collected as a direct result of Agent Myers's observation of the workbench's contents. *See* ECF No. 57 at 3–4; ECF No. 58 at 5. Accordingly, Agent Myers's initial interaction with the workbench constituted neither search nor seizure for Fourth Amendment purposes.

### C.     *Ms. Valenzuela's Search of the Workbench*

At the heart of the dispute in this case is Ms. Valenzuela's act of opening the locked workbench and displaying to police the illicit contents inside. The Government argues that the Fourth Amendment does not protect Defendant against the private search of the workbench by his wife. ECF No. 57 at 6. In the Government's view, Ms. Valenzuela searched the workbench on "her own initiative" and "was not acting as a governmental agent when she showed officers the contraband contained within the locked [workbench]." *Id.* at 7. Defendant argues that the search is not immune from Fourth Amendment scrutiny because "police knew of and acquiesced in the intrusive conduct and Ms. Valenzuela was acting to aid law enforcement to serve her own interest of having her husband arrested." ECF No. 58 at 5.

The Fourth Amendment only "protects individuals from government actors, not private ones." *United States v. Wilson*, 13 F.4th 961, 967 (9th Cir. 2021); *see also Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (noting the Fourth Amendment's "origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies"). Fourth Amendment protections are "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government

or with the participation or knowledge of any government official.'" *United States v. Jacobsen*, 466 U.S. 109, 113–14 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).  Accordingly, "evidence discovered in a private search is not subject to exclusion for failure to obtain a search warrant or otherwise comply with the requirements of the fourth amendment." *United States v. Sherwin*, 539 F.2d 1, 5–6 (9th Cir. 1976).  On the other hand, "the Fourth Amendment does prohibit unreasonable intrusions by private individuals who are acting as government instruments or agents." *Reed*, 15 F.3d at 931.  If a private search is deemed government action, evidence obtained as a result of the search may be suppressed in the absence of some other exception to the rule against warrantless searches and seizures.  *See id.* at 933.  "The defendant has the burden of showing government action." *Id.* at 931.

The Ninth Circuit "has recognized that there exists a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation." *Id.* (quoting *United States v. Walther*, 652 F.2d 788, 792–93 (9th Cir. 1981)).  "The resolution of cases falling within the 'gray area' can best be resolved on a case-by-case basis with the consistent application of certain general principles." *Walther*, 652 F.2d at 791; *see also Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989) ("Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities.").  The Ninth Circuit has synthesized those "general principles" into a two-part test to determine whether a private individual is acting as a government instrument or agent for Fourth Amendment purposes. *Reed*, 15 F.3d at 931.  According to this test, courts must inquire "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *Id.*; *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994).

/ / /

/ / /

"To satisfy the first requirement, the government must be involved in the search 'either directly as a participant or indirectly as an encourager of the private citizen's actions.'" *United States v. Rosenow*, 50 F.4th 715, 731 (9th Cir. 2022) (quoting *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981)). "[D]e minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny." *Walther*, 652 F.2d at 791. If, on the other hand, the private party's search is illegal, the Ninth Circuit has indicated that acquiescence may be found where the government was aware of, but did not discourage, the illegal conduct. *See Rosenow*, 50 F.4th at 732–33 ("[U]nless a private party's search is illegal or based on an illegitimate motive, our precedent requires 'active participation or encouragement' by the government before state action will be found."); *see also Walther*, 652 F.2d at 793, 793 n.2 (finding acquiescence where government did not discourage informant from engaging in illegal searches with the expectation of a reward); *Reed*, 15 F.3d at 932 (finding acquiescence where government "made no attempt to discourage" hotel owner from searching "beyond what was required to protect hotel property").

As to the second prong of the test, "a private party's interest in preventing criminal activity, on its own, is not a legitimate, independent motivation to search." *Rosenow*, 50 F.4th at 733. The Ninth Circuit, however, has "explained that a private party's 'legitimate, independent motivation' to further its own ends is 'not negated by any dual motive to detect or prevent crime or assist the police.'" *United States v. Wolfenbarger*, No. 16-CR-00519-LHK-1, 2019 WL 6716357, at *11 (N.D. Cal. Dec. 10, 2019) (citing *Cleaveland*, 38 F.3d at 1094).

Here, the Court finds that conduct of the Chula Vista police officers and Ms. Valenzuela falls within the "gray area" necessitating application of the Ninth Circuit's two-part test. The Chula Vista police officers did not overtly direct Ms. Valenzuela's search of the workbench, but neither were they completely uninvolved. The body-camera footage shows that upon learning that Defendant would not be arrested immediately for the alleged

sexual assault of her daughter, Ms. Valenzuela became distraught and told the officers, "So now the garage is open. I found the keys. What if you find things in that f--king thing?"—an apparent reference to the drugs in the workbench. D2 R25 at 3:15–3:21. Agent Myers responded, "We can't search the garage because that's his." *Id.* at 3:23–3:27. By "garage," Myers apparently was referring to the workbench, as police had already been inside the garage by that time. "He use the drugs that he has in there to put my daughter like that," Ms. Valenzuela said. *Id.* 3:30–3:35. "The pills that you were asking me [about] are in there, sitting, just watching everybody walking around," she continued. *Id.* 3:42–3:47. Ms. Valenzuela then told the officers she was accusing Defendant of being a drug trafficker, D2 R25 at 3:55–4:20, and later asked Agent Myers, "Can you at least see what is in the garage?" D2 R25 at 6:09–6:11. Agent Myers responded, "Sure, do you want to show me?" D2 R25 at 6:13.

Agent Myers and two other police officers then followed Ms. Valenzuela to the workbench and watched as she unlocked it and opened the top drawer. D2 R25 at 6:45–9:13. "How did you find the keys?" Agent Myers asked. D2 R25 at 6:43–6:45. "My daughter showed me all the keys that he has in his room," Ms. Valenzuela replied. D2 R25 at 6:45–6:48. As Ms. Valenzuela rummaged through the top drawer of the workbench, Agent Myers watched closely, shining a flashlight to illuminate the contents therein while keeping his free hand tucked away in his back pocket. After about two minutes of watching Ms. Valenzuela search through the top drawer of the workbench, Agent Myers told her to stop moving the objects around so that he could talk to his supervisor about the situation. D2 R25 at 9:05–9:10. Thus, while the Chula Vista police officers did not suggest the search to Ms. Valenzuela or personally manipulate the workbench or the contents therein, they clearly had some involvement with Ms. Valenzuela's search. Consequently, the Court will apply the two-part test to determine whether Ms. Valenzuela was functioning as a government instrument or agent at the time of her search.

/ / /

/ / /

Under the two-part test, the Court finds that Ms. Valenzuela was not functioning as a government instrument at the time of her search. As to the first prong, the Chula Vista officers clearly "knew of" Ms. Valenzuela's actions because they were physically present as she unlocked and searched the workbench. The officers, however, did not acquiesce in the search. As stated above, acquiescence may be shown in at least two ways: if the private party search is not illegal, the defendant must show that the government encouraged or directly participated in the search; if, on the other hand, the private party search is illegal, the Ninth Circuit has found acquiescence where the government did not discourage the illegal conduct. *See Rosenow*, 50 F.4th at 732–33; *id.* at 732 ("Nothing in our precedent establishes that a private party becomes a government actor simply because the government knows about and does not prevent such party from engaging in legally permissible conduct."); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 489 (1971) (finding that when private parties provide evidence to the Government "on [their] own accord," it is not incumbent on police to "stop [them]" or "avert their eyes"). Defendant has not shown that Ms. Valenzuela's actions, taken in isolation, were illegal. Nor is the Court aware of a prohibition on one spouse searching the personal property of another without consent. *Cf. United States v. Wilson*, 13 F.4th 961, 967 (9th Cir. 2021) ("[A] private party may conduct a search that would be unconstitutional if conducted by the government."). Accordingly, Defendant must show that the Chula Vista police actively participated or encouraged Ms. Valenzuela's search to satisfy the first prong of the government instrument test. Defendant has not met that burden.

The body-camera footage from the night of the investigation shows that the Chula Vista police officers declined to participate in attempts to access the workbench on multiple occasions. Before Ms. Valenzuela unlocked the workbench, her daughter asked Agent Myers, "You guys can't break it?" D3 R15 at 0:35–40. Agent Myers responded, "No, not without a search warrant. . . . I need a reason to get a search warrant." *Id.* at 0:40–0:50. Additional footage played during the evidentiary hearing showed the family asking the officers if they could break into the workbench. "Unfortunately, I can't break it," one of

the officers responded.   ECF No. 57 at 7.   Defendant's stepdaughter then asked, "What if I break it?"   *Id.*   The officer replied, "That's your decision.   It's your home . . . If you guys want to break it, I can't tell you not to; I can't tell you to . . . it's up to you . . . I can't physically do anything about it."   *Id.* at 7–8.

Moreover, the Chula Vista police were not aware of the drugs until Ms. Valenzuela and her daughter informed police that Defendant had secreted them inside his workbench. ECF No. 58 at 3.   Nor did the idea to open the workbench originate with police.   Ms. Valenzuela and her daughter proposed breaking into and unlocking the workbench without any encouragement or prompting by the investigating officers.   *Id.* at 4.   Ultimately, Ms. Valenzuela searched the workbench "of her own accord."   *Coolidge*, 403 U.S. at 489. Thus, the inception and execution of the search stemmed from private action, not that of the government.

Finally, as Ms. Valenzuela rummaged through the illicit contents of the workbench, Agent Myers merely stood next to her, with his free hand in his back pocket, and observed the drugs now exposed to his plain view.   D2 R25 at 6:40–9:20.   The only instruction that Agent Myers gave Ms. Valenzuela was to stop moving the contents inside the workbench so that he could confer with his supervisor.   *Id.* at 9:07–10.   Such conduct is a far cry from the "active participation or encouragement" required to trigger Fourth Amendment protections.   *See Rosenow*, 50 F.4th at 731; *see also Walther*, 652 F.2d at 792 ("The presence of law enforcement officers who do not take an active role in encouraging or assisting an otherwise private search has been held insufficient to implicate fourth amendment interests.").   Consequently, Defendant has failed to satisfy the first prong of the Ninth Circuit's government instrument test.

Given the absence of government acquiescence in Ms. Valenzuela's search, it is not necessary to scrutinize Ms. Valenzuela's motive in searching the workbench to determine whether she was acting as a government instrument.   Nevertheless, the Court finds that Ms. Valenzuela had a legitimate, independent motive for searching the workbench: the safety of herself and her family.   After Ms. Valenzuela was informed that Defendant would not

immediately be arrested, she was distraught and told police that she thought Defendant was armed. D2 R25 at 4:55–5:00. Though Defendant was not armed at that time, a handgun was located inside the residence. Evid. Mem. at 5. "We are not safe for the next 48 hours," Ms. Valenzuela said. *Id.* at 5:15–5:20. "I thought he was going to be arrested, so I can get all my stuff and all my clothes and leave," she continued. *Id.* at 5:20–5:27. After expressing her apparent fear that Defendant would return home and retaliate against the family for reporting the alleged sexual assault, Ms. Valenzuela offered to unlock the workbench and show the police officers what was inside. The Court acknowledges that Ms. Valenzuela and her family also made explicit their desire that Defendant be arrested so that he could not flee to Mexico and escape prosecution for the alleged sexual assault. *See id.* at 1:35–2:20. Opening the workbench was therefore at least partially motivated by Ms. Valenzuela's attempt to assist law enforcement efforts. This dual motive, however, does not negate Ms. Valenzuela's legitimate, independent motivation to protect herself and her family from retaliation by Defendant, as well as any other harm that could stem from having dangerous drugs in her home. *See Wolfenbarger*, No. 16-CR-00519-LHK-1, 2019 WL 6716357, at *11; *Cleaveland*, 38 F.3d at 1094; *see also United States v. Rosenow*, 50 F.4th 715, 735 (9th Cir. 2022) ("[A] private party's otherwise legitimate, independent motivation is not rendered invalid just because law enforcement assistance may further its interests."). Thus, Defendant has also failed to satisfy the second prong of the Ninth Circuit's government instrument test.

In sum, the Court finds that the Chula Vista police officers did not participate in or encourage the search of Defendant's workbench, and that Ms. Valenzuela had a legitimate, independent motivation for conducting the search herself. Therefore, Ms. Valenzuela was not acting as a government instrument or agent at the time of her search, and the search of the workbench did not infringe on Defendant's Fourth Amendment rights.

/ / /

/ / /

/ / /

### D.    Fruits of the Poisonous Tree

"[U]nder the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible." *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007).  Defendant asserts that the evidence seized from the safe in Ms. Beltran's room was "fruit of the poisonous tree" and should be suppressed.  *Id.* at 6.  The Court disagrees.  As the Court has not found a predicate Fourth Amendment violation, there can be no fruit of the poisonous tree.

## III.    Conclusion

The Court finds that Ms. Valenzuela had authority to consent to the search of the garage, that Agent Myers's initial peek inside the workbench was not a search or seizure for Fourth Amendment purposes, that Ms. Valenzuela was not functioning as a government instrument when she searched the workbench, and that no evidence may be suppressed under the fruit of the poisonous tree doctrine because there is no predicate constitutional violation.  Consequently, the Court **DENIES** Defendant's Amended Motion to Suppress Evidence.

## MOTION TO DISMISS FIREARM CHARGES

Defendant moves the Court to dismiss the indictment's charges of (1) possession of a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) (counts one through four); (2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c) (counts seven through ten); (3) possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) (count eleven); and (4) possession of an unregistered firearm silencer in violation of 26 U.S.C. §§ 5861(d) and 5871 (count twelve).  The Court **DENIES** the Motion for the reasons that follow.

## I.    The Parties' Arguments

Defendant's argument rests on the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  *Bruen* rejected a "two-step" framework for analyzing Second Amendment challenges that "combine[d] history with means-end scrutiny."  142 S. Ct. at 2125–26.  The second step—means-end

14

scrutiny—was "one step too many." *Id.* at 2127.  The Supreme Court in *Bruen* clarified that the appropriate framework focuses on history.  Specifically, to justify a regulation that prohibits conduct covered by the plain text of the Second Amendment, the government must demonstrate that "the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  If the government is unable to demonstrate such a tradition, then the regulation runs afoul of the Second Amendment.  *Id.*

According to Defendant, Ninth Circuit precedent upholding the constitutionality of prohibitions on felons possessing firearms and possessing firearms in furtherance of drug trafficking either relied on cases that applied means-end scrutiny or failed to conduct the requisite historical analysis and was therefore abrogated by *Bruen*.  Statement of Facts and Memorandum of Points and Authorities in Support of Motion to Dismiss Firearm Charges ("Firearm Mem.," ECF No. 49-1) at 9–10.  Defendant further contends that the Government is unable to identify an historical tradition supporting any of the firearm regulations that Defendant allegedly violated.  *Id.* at 11–25.  Accordingly, Defendant argues the Court must dismiss all firearm charges in the indictment.

The Government argues that while *Bruen* clarified the analysis Courts must apply when assessing a challenged firearm prohibition, it did not abrogate or otherwise upset precedent affirming the constitutionality of the prohibition on felons possessing firearms. Firearm Opp'n at 1–2.  Moreover, the Government contends that even if *Bruen* did upend such precedent, there is a historical tradition of prohibiting felons from possessing firearms. *Id.* at 13–21.  The Government argues that, at a minimum, there is a historical tradition of disarming those who commit serious or violent crimes; therefore, the prohibition on felons possessing firearms is constitutional as applied to Defendant, who has been convicted of two drug-related felonies.  *Id.* at 21–22.  Finally, the Government argues that possession of unregistered firearms and firearms with obliterated serial numbers is not conduct protected by the Second Amendment, and, even if it were, the regulations prohibiting such conduct are supported by historical analogues.  ECF No. 63 at 2–8.

/ / /

## II.  Discussion

### A.  18 U.S.C. §§ 922(g), 924(c)(1)(A)

Defendant contends that *Bruen* affected something of a sea change in Second Amendment law that requires reconsideration of essentially every firearm prohibition not already deemed lawful by the Supreme Court in *Bruen*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).  The Court finds Defendant's characterization of *Bruen* unconvincing.  A closer look at *Bruen*, *Heller*, and *McDonald* reveals that the cases are complimentary, rather than at odds with one another. Far from upsetting precedent, *Bruen* merely applied and clarified law established in *Heller* and *McDonald*.  Ninth Circuit precedent relying on those cases remains largely intact following *Bruen*; therefore, this Court remains bound by that precedent.

In *Heller* and *McDonald*, the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of "law-abiding, responsible citizens" to possess a handgun in the home for self-defense.  *Heller*, 554 U.S. at 635; *McDonald*, 561 U.S. at 791.  *Heller* also made clear that the right to keep and bear arms is not "unlimited."  554 U.S. at 626.  "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*  As such, the Supreme Court explained in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27.  The prohibitions included in this non-exhaustive list were described as "presumptively lawful."  *Id.* at 627 n.26.  *Heller* also recognized a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" and concluded that prohibitions on such weapons did not run afoul of the Second Amendment.  *Id.* at 627.  In *McDonald*, the Supreme Court "repeat[ed] those assurances."  561 U.S. at 786.

/ / /

Relying upon *Heller*, the Ninth Circuit in *United States v. Vongxay* concluded that the prohibition on felons possessing firearms, codified in 18 U.S.C. § 922(g)(1), did not violate the Second Amendment. 594 F.3d 1111, 1118 (2010). *Vongxay* noted that *Heller* drew a distinction between the rights of "law-abiding, responsible citizens" to possess handguns in the home for self-defense, and the rights of felons to do so. *Id.* at 1115; *see also Heller*, 554 U.S. at 644 (Stevens, J., dissenting) (noting that *Heller* "limits the protected class to 'law-abiding, responsible citizens'"). Accordingly, the Ninth Circuit in *Vongxay* held that "felons are categorically different from the individuals who have a fundamental right to bear arms." *Id.* *Vongxay* recognized that while the "historical question has not been definitely resolved," most scholars agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry and did not preclude laws disarming the unvirtuous citizens. *Id.* at 1118. Moreover, "[d]enying felons the right to bear arms is also consistent with the explicit purpose of the Second Amendment to maintain 'the security of a free State.'" *Id.* at 1117 (citing U.S. Const. amend. II; *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *cert. granted in part sub nom. District of Columbia v. Heller*, 552 U.S. 1035 (2007), *and aff'd*, 554 U.S. 570 2008)). In later cases, the Ninth Circuit relied on *Vongxay* to reaffirm the constitutionality of § 922(g). *See United States v. Phillips*, 827 F.3d 1171, 1174–76 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014).

In *United States v. Potter*, the Ninth Circuit again relied on *Heller* in concluding that the prohibition on possessing firearms in furtherance of drug trafficking, codified in 18 U.S.C. § 924(c)(1)(A), is constitutional. 630 F.3d 1260, 1261 (2011). The Ninth Circuit found that "[b]oth implicitly and explicitly," *Heller* made clear that its holding "concerned the *lawful* possession and use of a firearm." *Id.* at 1261. Moreover, the Ninth Circuit noted that the plurality in *McDonald* reiterated *Heller's* "central holding" that "the Second Amendment protects a personal right to keep and bear arms for *lawful purposes*." *Id.* (quoting *McDonald*, 561 U.S. at 781 (emphasis added)). Therefore, it could not "seriously be contended that the Second Amendment guarantees a right to use a firearm *in furtherance*

*of drug trafficking*." *Id.*

"This Court is bound by this Ninth Circuit precedent unless that precedent is 'effectively overruled,' which occurs when 'the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority.'" *United States v. Hill*, No. 21CR107 WQH, 2022 WL 4361917, at *2 (S.D. Cal. Sept. 20, 2022) (quoting *Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003) (en banc)). "The clearly irreconcilable requirement is a high standard." *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018). "[I]t is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent." *Id.* Accordingly, the issue is whether *Bruen* is "clearly irreconcilable" with *Heller*, *McDonald*, or their Ninth Circuit progeny.

In *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*," that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home. *Bruen*, 142 S. Ct. at 2122. "In keeping with *Heller*," the Supreme Court in *Bruen* clarified the appropriate analytical framework for challenges to regulations prohibiting conduct falling within the scope of the Second Amendment:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2126 (internal quotations omitted). This test, which the Supreme Court describes as the same as *Heller*'s, "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. As in *Heller* and *McDonald*, at least two metrics will guide the inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

The majority and concurring opinions in *Bruen* demonstrate that the justices viewed themselves as simply applying the law established in *Heller* and *McDonald*.  *See United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at \*2 (D.S.C. Aug. 25, 2022) ("*Bruen* clarified and 'reiterated[,]' rather than modified, the constitutional ruling in *Heller*.").   For example, the majority opinion in *Bruen* stressed that its holdings were "consistent" and "[i]n keeping" with *Heller* and *McDonald*.  *See id.* at 2122, 2126.  Justice Alito's concurring opinion made clear that *Bruen* did not disturb anything the Supreme Court said in *Heller* or *McDonald* "about restrictions that may be imposed on the possession or carrying of guns," nor did *Bruen* itself decide anything about "who may lawfully possess a firearm," "the requirements that must be met to buy a gun," or "the kinds of weapons that people may possess."   *Id.* at 2157 (Alito, J., concurring).   Justice Kavanaugh's concurring opinion, joined by Justice Roberts, describes *Bruen* as "employ[ing] and elaborat[ing] on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense."  *Id.* at 2161 (Kavanaugh, J., concurring).   Justice Kavanaugh cited *Heller* for the proposition that the Second Amendment, if properly interpreted, "allows a 'variety' of gun regulations."  *Id.* at 2162.  Thus, Justices Kavanaugh, Roberts, and Alito "desire[d] to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the remaining viability of the Supreme Court's statements in *Heller* and its progeny as to specific conduct which falls outside of the protection of the Second Amendment."  *United States v. Minter*, No. 3:22-CR-135, 2022 WL 10662252, at \*6 (M.D. Pa. Oct. 18, 2022).   Even Justice Breyer's dissenting opinion stated that *Bruen* "cast[s] no doubt on" *Heller's* list of "presumptively lawful" firearms regulations.  *Id.* at 2189 (Breyer, J., dissenting).

Consequently, nothing in *Bruen* can reasonably be read to abrogate or otherwise upset *Heller* or *McDonald*.   Indeed, the two cases survived *Bruen* unscathed, if not refortified.  Likewise, *Vongxay* and *Potter* are not "clearly irreconcilable" with *Bruen*.  As a preliminary matter, both cases dealt with conduct falling outside of the Second

21-CR-1590 JLS

Amendment.   In *Heller*, *McDonald*, and *Bruen*, the Supreme Court repeatedly distinguished law-abiding citizens from non-law-abiding citizens and indicated that only the conduct of the former falls within the scope of the Second Amendment.  *See United States v. Snead*, No. 1:22-CR-033, 2022 WL 16534278, at *5 (W.D. Va. Oct. 28, 2022) ("This trilogy of Supreme Court cases makes clear that the Second Amendment protects the conduct of law-abiding citizens, and provides no constitutional sanctuary for those who use firearms to commit crimes."); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *9 (W.D. Pa. Nov. 7, 2022) ("*Bruen* generally left undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons.").

This distinction is magnified by the cases' central holdings, which are that the Second Amendment protects an individual's right to possess a firearm inside and outside the home for *self-defense* and other *lawful purposes*.  *See Heller*, 554 U.S. at 628, 630 (finding "the inherent right of self-defense has been central to the Second Amendment right," and citizens must be permitted to use firearms "for the core lawful purpose of self-defense"); *McDonald*, 561 U.S. at 780 (same); *Bruen*, 142 S. Ct. at 2135 (same).  Clearly, being a convicted felon necessarily means that one is not a law-abiding citizen, and furthering drug trafficking is neither self-defense nor lawful.  Accordingly, the activity regulated by the prohibitions against felons in possession of firearms and possession of a firearm in furtherance of drug trafficking is "categorically unprotected," *see* 142 S. Ct. 2126, and the holdings of *Vongxay* and *Potter* remain binding on this Court.  Therefore, the Court finds, consistent with Ninth Circuit precedent, that §§ 922(g) and 924(c)(1)(A) do not infringe upon the rights guaranteed by the Second Amendment.

Nevertheless, Defendant contends that *Vongxay* simply relied on *Heller's* list of "presumptively lawful" firearms restrictions without conducting a full historical analysis as required by *Bruen*.  Firearm Mem. at 7.  Contrary to Defendant's assertion, however, *Vongxay* based its holding in part on a historical analysis of the Second Amendment.  The Ninth Circuit stated that its "examination . . . of historical gun restrictions . . . lends credence to the post-*Heller* viability" of the court's pre-*Heller* holding that the federal

felon-in-possession law does not violate the Second Amendment. *Vongxay*, 594 F.3d at 1116; *see also United States v. Hill*, No. 21CR107 WQH, 2022 WL 4361917, at *2 (S.D. Cal. Sept. 20, 2022). Moreover, even if Defendant's assertion were correct, the Court interprets *Bruen* as requiring a full historical analysis of the text of the Second Amendment only when the regulated conduct is protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2126 (holding the government must demonstrate that "the regulation is consistent with this Nation's historical tradition of firearm regulation" only "when the Second Amendment's plain text covers an individual's conduct"). Defendant raises the same argument regarding the Ninth Circuit's decision in *Potter*. Firearm Mem. at 9. While the Ninth Circuit in *Potter* did not conduct anything resembling the type of historical inquiry envisioned by *Bruen*, it was not required to, as possessing a firearm in the furtherance of drug trafficking clearly falls outside the scope of the Second Amendment.

Because the Court is bound by Ninth Circuit precedent upholding the constitutionality of §§ 922(g) and 924(c)(1)(A), the Court declines to address whether the regulations are consistent with this Nation's history of firearm regulation, as well as the Government's alternative argument that § 922(g) is constitutional as applied to Defendant due to his prior felony convictions for drug trafficking.

### B. 18 U.S.C. § 922(k)

Under the *Bruen* framework, the Court must first determine whether § 922(k) regulates conduct protected by the Second Amendment. Section 922(k) reads:

> It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922. As discussed above, the Supreme Court in *Heller*, *McDonald*, and *Bruen*, found that the Second Amendment protects the right of "law-abiding, responsible citizens" to "possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592; *supra*

15–19.  Consequently, § 922(k)'s constitutionality hinges on whether a criminal prohibition on the possession of a firearm with an obliterated serial number "burden[s] a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.

The Court finds that the Second Amendment's plain text does not cover the conduct regulated by § 922(k).  A law requiring that firearms have serial numbers simply does not infringe a law-abiding citizen's right to keep and bear arms for self-defense and other lawful purposes.  "[F]irearms of similar make and model are essentially fungible, and 'the presence of a serial number does not impair the use or functioning of a weapon in any way[.] . . . [A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm.'"  *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *4 (N.D. Tex. Nov. 3, 2022) (quoting *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111).  Under § 922(k), law-abiding citizens are free to possess and carry a firearm for self-defense, provided that firearm has a serial number.  In other words, § 922(k) merely restricts "one manner in which individuals may keep and carry firearms."  *Holton*, 2022 WL 16701935, at *4.  On the other hand, the challenged regulation in *Heller* imposed an "*absolute prohibition* of handguns held and used for self-defense in the home," 554 U.S. at 636 (emphasis added), and the challenged regulation in *Bruen* "*broadly prohibit*[*ed*] the public carry of commonly used firearms for self-defense," 142 S. Ct. at 2138 (emphasis added).  This contrast illustrates that while the regulations in *Heller* and *Bruen* essentially foreclosed self-defense with commonly used firearms for most people, § 922(k)'s regulation is aimed at a "nonfunctional characteristic" of firearms that has no effect on a law-abiding citizen's right or ability to defend themselves with a firearm.  *See United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022).

Moreover, the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  *Heller* "made clear that the Second Amendment's reach does not extend to

'those weapons not typically possessed by law-abiding citizens for lawful purposes.'" *Reyna*, 2022 WL 17714376, at \*4.  As the United States District Court for the Northern District of Indiana recently noted:

> Guns with obliterated serial numbers are useful for criminal activity because identifying who possessed a firearm is more difficult when the serial number is destroyed.  By using a gun without a serial number, a criminal ensures he has a . . . higher likelihood of evading justice. . . . A law-abiding citizen who uses a gun for self-defense has no reason to prefer a deserialized gun to a gun with serial number intact.

*Id.* at \*5; *see also United States v. Colon-Quiles*, 859 F. Supp. 2d 229, 234 (D.P.R. 2012) ("[T]his Court cannot identify any lawful purpose that would be served by obliterating a serial number on a firearm.").  Accordingly, "[g]uns with obliterated serial numbers belong to 'those weapons not typically possessed by law-abiding citizens for lawful purposes' so possession of such guns isn't within the Second Amendment's scope."  *Reyna*, 2022 WL 17714376, at \*5.

Finally, even if the Second Amendment did protect the conduct regulated by § 922(k), the Government has demonstrated that § 922(k) is consistent with this Nation's history of firearm regulation.  In *Bruen*, the Supreme Court explained that when confronting "regulations that were unimaginable at the founding," courts often will need to engage in "reasoning by analogy."  *Id.*  Analogical reasoning is appropriate here because serial numbers arose "only with the advent of mass production of firearms" in the mid-1800s.  *See Marzzarella*, 614 F.3d at 94 n.11.  To determine whether two regulations are "relevantly similar," courts should look to two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132–33.  Such "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* at 2133.  *Bruen* also "emphasized that the most compelling historical evidence was that immediately preceding and succeeding the ratification of the Second Amendment in 1791."  *Holton*, 2022 WL 16701935, at \*4.

Here, the Government has offered several historical regulations that burdened an individual's Second Amendment rights in a similar manner and for similar purposes. The Government notes that "[t]here have been proscriptions on the commercial sale and transport of firearms since the Founding Era," and that the Ninth Circuit has previously recognized that "'colonial governments substantially controlled the firearms trade.'" ECF No. 63 at 6–7 (quoting *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)). "A 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 76 (2017) (citing Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds [sic] in New Netherland by Private Persons, 1652 N.Y. Laws 128). Moreover, "[a] 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* (citing Virginia Act of Feb. 27, 1631). "In response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeira*, 873 F.3d at 685. For example, Connecticut prohibited selling firearms outside the colony, while Virginians were only at "'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony.'" *Id.* at 685, 685 n.18 (first citing 1 Trumbull, *Public Records of the Colony of Connecticut*, 138–39, 145–46; then citing Laws of Va., Feb., 1676–77, Va. Stat. at Large, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 403 (1823)).

These historical regulations were designed to combat illegal arms and ammunition trafficking and to ensure that individuals considered dangerous did not obtain firearms. *See* Spitzer, *supra*, at 76; *Holton*, 2022 WL 16701935, at *5. Likewise, the Gun Control Act of 1968, from which § 922(k) originates, was intended "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v.*

*United States*, 423 U.S. 212, 218 (1976).  "The goal of § 922(k), in particular, is to assist law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source."  *Marzzarella*, 614 F.3d at 98. Accordingly, the historical regulations and § 922(k) serve analogous purposes.

Further, assuming § 922(k) regulates conduct within the scope of the Second Amendment, the Court finds that § 922(k) burdens an individual's right to armed self-defense in a manner comparable to historical firearm regulations.  Requiring individuals to purchase firearms with serial numbers and to not subsequently remove the serial number imposes a "negligible burden" on an individual's right to armed self-defense because serial numbers have no effect on a firearm's utility.  *See Holton*, 2022 WL 16701935, at *5. Likewise, sale restrictions and recording requirements did not detract from early American's ability to defend themselves with firearms.  If anything, the historical regulations "imposed greater burdens on firearm owners and sellers," as recording requirements necessitated action by firearm owners and the sale restrictions placed greater limitations on the market for firearm sales than does § 922(k).  *Id.*

In sum, the Court finds that § 922(k) regulates conduct outside the scope of the Second Amendment, and, even if the Second Amendment did encompass such conduct, § 922(k) is consistent with this Nation's history and tradition of firearm regulation.

### B.   26 U.S.C. §§ 5861(d), 5871

The Court finds that 26 U.S.C. §§ 5861(d) and 5871 are constitutional for the same reasons that § 922(k) is constitutional.  The regulations are two sides of the same coin. Where § 922(k) criminally prohibits the possession of a firearm with an obliterated serial number, § 5861(d) makes it unlawful "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," the penalty for which is proscribed in § 5871.  The National Firearms Registration and Transfer Record ("NFRTR") includes "identification of the firearm," "date of registration," and "identification and address of person entitled to possession of the firearm."  26 U.S.C. § 5841.  Thus, if a firearm has an obliterated serial number, law enforcement may not be able

to identify its owner on the NFRTR.  Likewise, if a firearm is not registered on the NFRTR, law enforcement could not use a firearm's serial number to identify its owner. Accordingly, the regulations are complimentary, serving identical law enforcement purposes through comparable mandates.  Consequently, the Court's findings that § 922(k) does not regulate conduct covered by the Second Amendment, and even if it did, the regulation is justified by historical analogues, also apply to 26 U.S.C. § 5861(d) and 5871.

First, a law-abiding citizen is equally able to defend themselves with a firearm registered in the National Firearms Registration and Transfer Record ("NFRTR") as they are with a firearm not so registered.  Like § 922(k), § 5861(d) merely restricts "one manner in which individuals may keep and carry firearms," *Holton*, 2022 WL 16701935, at *4, without foreclosing the use of common self-defense weapons for most people.  Relatedly, the Court cannot identify any purpose that would be served by failing to register a firearm in the NFRTR other than to avoid law enforcement efforts.  Sections 5861(d) and 5871 were enacted under the National Firearms Act, the object of which was "to regulate certain weapons likely to be used for criminal purposes."  *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992).  "The Supreme Court in *Bruen* and *Heller* confirmed that such weapons are not protected under the Second Amendment."  *Holton*, 2022 WL 16701935, at *3.  Consequently, §§ 5861(d) and 5871 do not regulate conduct protected by the Second Amendment.

Second, even if §§ 5861(d) and 5871 did regulate conduct protected by the Second Amendment, the regulations are consistent with this Nation's history and tradition of firearms regulation, as exemplified by the historical analogues described above.  *See supra* at pp. 24–25.  Accordingly, the Court finds that 26 U.S.C. §§ 5861(d) and 5871 do not infringe on any right guaranteed by the Second Amendment.

As Justice Kavanaugh noted in his concurring opinion in *Bruen*, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).  For example, the "objective shall-issue [firearm] licensing regimes" used in 43 states are

"constitutionally permissible," according to Justice Kavanaugh, even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). If such onerous requirements for firearm possession pass constitutional muster, the firearm registration schema enforced through 18 U.S.C. § 922(k) and 26 U.S.C. §§ 5861(d) and 5871 surely falls within the "variety" of gun regulations allowed by the Second Amendment. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

## III. Conclusion

The Court finds that *Bruen* did not abrogate binding Ninth Circuit precedent upholding the constitutionality of 18 U.S.C. §§ 922(g) and 924(c)(1)(A). Moreover, 18 U.S.C. § 922(k), as well as 26 U.S.C. §§ 5861(d) and 5871, regulate conduct not protected by the Second Amendment, and, even if the Court were to assume they did, the regulations are sufficiently consistent with this Nation's historical tradition of firearms regulation. Consequently, the Court **DENIES** Defendant's Motion to Dismiss Firearm Charges.

## CONCLUSION

In light of the foregoing, the Court **DENIES** Defendant's Amended Motion to Suppress Evidence (ECF No. 40) and **DENIES** Defendant's Motion to Dismiss Firearm Charges (ECF No. 49).

**IT IS SO ORDERED.**

Dated: January 17, 2023

Hon. Janis L. Sammartino
United States District Judge

21-CR-1590 JLS